# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-09-00646-CR

**Joseph Urtado, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 403RD JUDICIAL DISTRICT
### NO. D-1-DC-09-904068, HONORABLE BRENDA KENNEDY, JUDGE PRESIDING

## O P I N I O N

Appellant Joseph Urtado appeals from his conviction of three counts of aggravated assault with a deadly weapon and two counts of assault. Punishment was assessed by a jury at 55 years' confinement on each of the first two counts of aggravated assault, 15 years' confinement on the third count of aggravated assault, one year's confinement on the first count of assault, and a $500 fine on the second count of assault, with all sentences to run concurrently. We affirm the judgments of conviction.

## BACKGROUND

At the time of the incident giving rise to Urtado's arrest, Urtado was sharing a house with two roommates, Noah Jones and David Galvan. According to the testimony presented at trial, Urtado's girlfriend, Ana Trujillo, was also staying at the house, as was Jones's girlfriend, Raven Cazares.

In the early morning hours of March 18, 2009, Galvan and his girlfriend, Ashley Quiroga, returned to the house after celebrating Galvan's birthday at bars and clubs in downtown Austin. Quiroga testified that she had gone upstairs with Galvan and was helping him get into bed when she heard the sound of someone screaming on the first floor of the house. Quiroga exited the bedroom and observed Urtado dragging Trujillo up the stairs by her hair. Quiroga stated that when she attempted to intervene, Urtado became angry and punched her in the forehead, causing her to fly backwards and hit her head on the doorframe.

Galvan testified that after seeing Quiroga "fl[y] against the wall," he jumped out of bed and confronted Urtado. Urtado then pushed him and the two began wrestling. Galvan testified that at some point during the struggle, Urtado pulled out a knife and began to stab him. Quiroga's testimony is consistent with the statement, as she testified that she saw a knife in Urtado's hands during the initial struggle between Urtado and Galvan. The physician who treated Galvan after the incident testified that Galvan suffered lacerations on his arm, temple, cheekbone, rib cage, and back, as well as a life-threatening laceration on his neck that was fifteen centimeters long. Photographs of Galvan's wounds were also entered into evidence.

According to Quiroga, Jones eventually intervened and the struggle ended. When asked "Was there a break at this point?" Quiroga answered, "I think so." Quiroga also testified that Jones is trained as a nurse, and that he maneuvered Galvan "into the restroom to figure out where he was bleeding from and just try to take care of him in the restroom and get away from the whole situation." While Galvan was in the restroom with Jones, Quiroga called 9-1-1. A recording of the 9-1-1 call was entered into evidence. While Quiroga was on the phone with the dispatcher, Galvan

2

emerged from the restroom and Urtado attacked him again. According to Quiroga, Urtado was "waving his knife everywhere, and then he cuts [Galvan] across the back with the knife." Quiroga further testified that Urtado stated, "I'm going to kill you all," while still holding the knife in his hand. Galvan also testified regarding this second incident, stating that Urtado tackled him to the ground and punched him repeatedly until Jones pulled Urtado away. Galvan initially testified that Urtado did not use the knife during the second attack, but then stated, "I'm actually not positive." He later explained, "I wasn't sure . . . how many times I was stabbed. I just know that I was stabbed."

Trujillo also testified at trial, stating that on the evening in question, she and Urtado had gone to several clubs and bars in downtown Austin before accepting a ride home from Jones and Cazares. Trujillo testified that in the car on the way home, Urtado "started poking [her] leg with a knife," then held the knife to her throat without speaking. When they returned to the house, Urtado asked her to accompany him upstairs to his bedroom, but she refused. Urtado then became angry and began dragging her up the stairs by the hair, hitting her as he did so. Trujillo further testified that Quiroga attempted to intervene and that Galvan came out and began arguing with Urtado, until Urtado pulled out a knife and stabbed Galvan "towards the head." After stabbing Galvan, Urtado came back and punched Trujillo in the face, saying, "Look what you made me do." Trujillo then fled the house by jumping out of a second-story window.

Jones also testified regarding the events of the evening, stating that he was downstairs putting groceries away when he heard Quiroga scream for help. Jones testified that he walked up in time to see Urtado pull Trujillo up the stairs, Quiroga fly across the room as if she had been

3

pushed, and Urtado stab Galvan with the knife. Jones also testified that he attempted to treat Galvan's stab wounds in the restroom, but that after Galvan left the restroom, the two men "got into it again." Regarding this second incident, Jones stated, "I guess [Urtado] goes into trying to stab him again and [Galvan] keeps wiggling away, and he was pretty quick, but he did get a bunch of slices from him." With the help of another friend who was in the house at the time, Jones eventually pulled Urtado off of Galvan. Jones testified that Urtado then took a step backwards and fell down the stairs. After Urtado got up and left the house, Jones locked the door behind him.

Urtado testified on his own behalf at trial and presented a different version of the facts than the one testified to by Trujillo, Galvan, Quiroga, and Jones. Urtado testified that shortly after returning to the house from downtown, he became upset with Trujillo because she would not accompany him upstairs to his bedroom. Urtado denied punching Trujillo or pulling her by the hair, stating, "I did get upset and I grabbed her, but I grabbed her by her shoulder. . . . I started taking her up the stairs, pulling her up the stairs." Urtado testified that when he reached the top of the stairs, Galvan came out of his bedroom and "said something like don't be putting your hands on a female." According to Urtado, he and Galvan then cursed at each other until Galvan pushed Quiroga to the side, causing her to bump her head, and the two men began fighting. Urtado stated that this first fight was limited to fist-fighting, and that it ended when he "dropped" Galvan and went into his bedroom to look for Trujillo. At that point, Urtado discovered that Trujillo had jumped out of the second-story window.

Urtado explained that the second fight began when he exited his bedroom and Galvan came out of a bedroom, "charging" at him. Urtado stated that Galvan came out "running with the knife" and the two men began wrestling again, until the fight was broken up by Jones and another

4

friend. Urtado then turned to go downstairs and leave the house, but Galvan hit him in the back of the head. The two began to fight again, ultimately rolling down the stairs together. At that point, Urtado pushed Galvan away and ran outside. He was approached by the police shortly thereafter. When asked about Galvan's knife wounds, Urtado testified that Galvan must have inadvertently inflicted them on himself during the struggle. Urtado also denied threatening Trujillo in the car earlier that evening.

After hearing the evidence, the jury found Urtado guilty of three counts of aggravated assault with a deadly weapon and two counts of assault. The court entered a family-violence finding in connection with the first three counts, in which Galvan was the victim. After finding an enhancement paragraph regarding a prior conviction of aggravated assault to be true, the jury assessed punishment at 55 years' confinement on each of the first two counts of aggravated assault, fifteen years' confinement on the third count of aggravated assault, one year's confinement on the first count of assault, and a $500 fine on the second count of assault. This appeal followed.

In three issues on appeal, Urtado argues that the indictment returned against him violated his due-process rights, that certain incidents of prosecutorial misconduct occurred during his trial, and that the trial court erred in excluding impeachment evidence of a prior misdemeanor committed by Galvan.

## DISCUSSION

*The Indictment*

In his first issue on appeal, Urtado complains that the indictment returned against him violated his right to due process because it failed to provide sufficient notice of the acts for which he was charged, was impermissibly duplicitous, and was impermissibly multiplicitous.

Urtado raises these objections to the indictment for the first time on appeal. Article 1.14(b) of the code of criminal procedure provides, in relevant part:

> If the defendant does not object to a defect, error, or irregularity of form or substance in an indictment or information before the date on which the trial on the merits commences, he waives and forfeits the right to object to the defect, error, or irregularity and he may not raise the objection on appeal or in any other postconviction proceeding.

Tex. Code Crim. Proc. Ann. art. 1.14(b) (West 2005). Thus, a defect in a charging instrument is waived unless raised before trial. *See Teal v. State*, 230 S.W.3d 172, 177 (Tex. Crim. App. 2007) (holding that defendant must "object to any error in the indictment before the day of trial and certainly before the jury is empaneled").

Urtado argues, however, that his complaints may be raised for the first time on appeal because they implicate fundamental rights. *See Marin v. State*, 851 S.W.2d 275, 279 (Tex. Crim. App. 1993) ("All but the most fundamental rights are thought to be forfeited if not insisted upon by the party to whom they belong."). Urtado's multiplicity argument, in which he asserts that the indictment improperly charged a single criminal offense in counts one, two, five, and six, represents a double-jeopardy claim. *See Evans v. State*, 299 S.W.3d 138, 140-41 (Tex. Crim. App. 2009) ("The Double Jeopardy Clause of the Fifth Amendment . . . protects an accused against . . . multiple punishments for the same offense."). Such a claim may be raised for the first time on appeal when the double-jeopardy violation is clearly apparent on the face of the record and when no legitimate state interest is served by the enforcement of usual rules of procedural default. *Gonzalez v. State*, 8 S.W.3d 640, 643 (Tex. Crim. App. 2000); *see also Benton v. Maryland*, 395 U.S. 784, 794 (1969)

6

(describing double-jeopardy prohibition as "a fundamental ideal in our constitutional heritage"). As a result, we will address the merits of Urtado's double-jeopardy argument. Urtado's remaining challenges to the indictment, however, do not implicate fundamental rights, and were therefore waived by his failure to timely object. *See Mills v. State*, 941 S.W.2d 204, 209 (Tex. App.—Corpus Christi 1996, pet. ref'd) (holding that complaint regarding sufficiency of notice of charges indictment was waived for failure to properly object prior to trial); *Skillern v. State*, 890 S.W.2d 849, 872 (Tex. App.—Austin 1994, pet. ref'd) (holding that duplicity in indictment may not be raised on appeal without timely objection prior to trial).

Urtado argues that counts one, two, five, and six of the indictment allege the same criminal offense. Count one alleges assault causing serious bodily injury to Galvan, with a knife as a deadly weapon. Count two alleges assault causing bodily injury to Galvan, with a knife as a deadly weapon.[1] Count five alleges assault causing bodily injury to Trujillo, with either hands or a knife as a deadly weapon. Count six alleges assault by threatening bodily injury to Trujillo, with either hands or a knife as a deadly weapon. The jury found Urtado guilty of counts one through three as alleged in the indictment, but did not make a deadly-weapon finding in connection with their guilty verdict in counts five and six. As a result, Urtado was convicted of aggravated assault in counts one through three, but assault in counts five and six. *See* Tex. Penal Code Ann. § 22.02(a)(2) (West Supp. 2010) (providing that assault is elevated to aggravated assault when deadly weapon is used or exhibited).

---

[1] Count three, about which Urtado does not complain, alleges aggravated assault by threatening Galvan with imminent bodily injury, with a knife as a deadly weapon. Count four was abandoned by the State prior to trial.

7

For double-jeopardy purposes, assaults on different victims represent separate offenses. *See Ex parte Taylor*, 101 S.W.3d 434, 440 (Tex. Crim. App. 2002); *see also Ex parte Hawkins*, 6 S.W.3d 554, 560 (Tex. Crim. App. 1999) ("In Texas, the allowable unit of prosecution for an assaultive offense is each victim."). Thus, there is no double-jeopardy concern related to counts one and two versus counts five and six, as counts one and two name Galvan as the victim, while counts five and six name Trujillo as the victim.

Counts five and six allege assault by causing bodily injury and assault by threatening bodily injury, both against Trujillo. *Compare* Tex. Penal Code Ann. § 22.01(a)(1) (West Supp. 2010) (assault by causing bodily injury to another), *with id.* § 22.01(a)(2) (West Supp. 2010) (assault by threatening another with imminent bodily injury). When separate and distinct offenses occur in the same transaction, the protection against double jeopardy does not apply. *Spradling v. State*, 773 S.W.2d 553, 556 (Tex. Crim. App. 1989). Thus, if two different attacks occur, even if close in time, a defendant may be charged with two separate assaults. *Compare Sanchez v. State*, 269 S.W.3d 169, 171 (Tex. App.—Amarillo 2008, pet. ref'd) (holding that no double-jeopardy violation occurred where defendant was charged with both assault by causing bodily injury and assault by threat against same victim because, "[t]hough rather close in time, the latter arose after a break from the former"), *with Teeter v. State*, No. PD-1169-09, 2010 Tex. Crim. App. LEXIS 1206, at \*24 (Tex. Crim. App. Sept. 22, 2010) (holding that double jeopardy violation occurred where charges of assault by threat and attempted capital murder were both based on single act of pointing gun at victim).

Here, as in *Sanchez*, the evidence suggests that the assault causing bodily injury against Trujillo was a separate event from the assault by threat against Trujillo. Both Trujillo and

Quiroga testified that Urtado hit Trujillo and pulled her hair while dragging her up the stairs. A photograph of Trujillo's scalp after the assault, depicting the area where hair had been pulled out, was entered into evidence. When asked about her injuries from the hitting and hair-pulling, Trujillo testified that "[e]verything hurt the next day." After this assault occurred, Urtado turned his attention to Quiroga and Galvan, ultimately attacking Galvan with a knife. It was only after attacking Galvan that Urtado announced, "I'm going to kill you all," while holding the knife in his hand. Galvan testified that Trujillo was in the room at the time this threat was made.[2] Trujillo also testified to an incident earlier in the evening in which Urtado had poked her leg with a knife and silently held the knife to her throat. Either of these events could form the basis of a charge of assault by threat, separate from the assault causing bodily injury to Trujillo. *See Sanchez*, 269 S.W.3d at 171. As a result, we cannot conclude that a double-jeopardy violation is apparent on the face of the record in connection with counts five and six.

Counts one and two allege assault by causing serious bodily injury to Galvan and assault by causing bodily injury to Galvan. *See* Tex. Penal Code Ann. § 22.02(b)(1) (West Supp. 2010) (family-violence aggravated assault with deadly weapon is elevated to first-degree felony if actor causes serious bodily injury). As in counts five and six, these two offenses are based on separate incidents and conduct. *See Johnson v. State*, 208 S.W.3d 478, 510 (Tex. App.—Austin 2006, pet. ref'd) (holding that double-jeopardy violations are apparent on face of record where it is

---

[2] Trujillo testified, on the other hand, that she did not remember Urtado making any verbal threat to kill her.

9

undisputed that "two convictions are based on the same conduct"); *see also Sanchez*, 269 S.W.3d at 171.

The eye-witnesses made a distinction in their testimony between the first struggle between Urtado and Galvan, which occurred prior to the Galvan's retreat to the bathroom, and the second struggle, which occurred after Galvan emerged from the restroom and began while Quiroga was on the phone with the 9-1-1 dispatcher. When specifically asked whether a break occurred while Galvan was in the restroom, Quiroga stated, "I think so. Yes." On cross-examination, she was asked multiple questions distinguishing the "first incident" from the "second incident," which, according to Quiroga, began when Galvan "walked out of the restroom." Galvan also answered questions regarding the "second fight" or "second incident," and confirmed that his most serious injury, the fifteen-centimeter laceration on his neck, occurred during the first incident. When asked, "Was this really a fight when [Urtado] comes at you the second time?" Galvan answered, "No, it was more like a beatdown." Jones also testified that a separation occurred while Galvan was in the restroom, before the two men "got into it again." Urtado also distinguished between the two fights, testifying that "the first fight" consisted only of hand-to-hand combat. Urtado explained that when the first fight ended, he went into his room and discovered that Trujillo had jumped out of the window. It was only after Urtado exited his bedroom that Galvan came running out "the second time" with a knife. Urtado later clarified that this occurred "[a]fter I already fought him the first time." The beginning of the second assault can also be heard on the recording of the 9-1-1 call, indicating a break in the action between the first and second assaults.

10

Given Galvan's testimony that his most serious injury, the cut to his neck, occurred prior to the 9-1-1 call, the testimony surrounding the first incident supports a charge of aggravated assault causing serious bodily injury to Galvan, while the testimony surrounding the second incident supports a separate charge of aggravated assault by causing bodily injury to Galvan. *See Ex parte Goodbread*, 967 S.W.2d 859, 860 (Tex. Crim. App. 1998) ("[W]hen one cannot determine from the State's pleadings whether the offenses prosecuted are the same, the court must look to the proof offered at trial."). Because the two assaults at issue here occurred in identifiable, discrete stages, we conclude that Urtado was not punished twice for the same offense. *See Sanchez*, 269 S.W.3d at 171 (holding that where two "attacks occurred in identifiable, discrete stages," even though close in time, the appellant was not punished twice for the same offense, but for two different crimes).

Because no double-jeopardy violation is apparent on the face of the record and because Urtado's remaining complaints regarding the indictment were waived, we overrule Urtado's first issue on appeal.

*Prosecutorial Misconduct*

In his second issue on appeal, Urtado raises a number of complaints of prosecutorial misconduct, citing to statements made by the State in opening statement and closing argument. Specifically, Urtado contends that during opening statement, the State improperly suggested that the evidence would support the State's view of the case, injected personal opinion, and improperly informed the jury that the recording of the 9-1-1 call was the "real" opening statement. Urtado further contends that during closing argument, the State improperly bolstered Jones's testimony by saying, "He's not lying to you," argued evidence outside the record such as whether it is physically

11

possible for a person to cut their own back, improperly injected personal opinion as to Urtado's character, and improperly suggested that Urtado's attorneys were forced to argue self-defense out of an obligation to zealously represent their client. Urtado also asserts that the State was allowed to ask an improper commitment question during voir dire.

First, we note that Urtado's second issue is multifarious. *See Mays v. State*, 318 S.W.3d 368, 385 (Tex. Crim. App. 2010) (stating that multifarious point of error "risks rejection on that basis alone"). Second, no objection was made to any of the statements made during opening statement or closing argument that Urtado now complains were improper. *See* Tex. R. App. P. 33.1 (in order to preserve error for appellate review, complaint must be made to trial court by timely request, objection, or motion).[3] Furthermore, none of the complained-of statements are sufficiently egregious to bear on the presumption of innocence or vitiate the impartiality of the jury, and therefore the doctrine of fundamental error does not apply. *See Jasper v. State*, 61 S.W.3d 413, 421 (Tex. Crim. App. 2001). Accordingly, we will limit our discussion of Urtado's second point of error to his properly preserved complaint that the State was permitted to ask an improper commitment question during voir dire.

_____

[3] Urtado's complaint that the State improperly injected a personal opinion on his character into closing argument is based, in part, on the prosecutor's statement that the State's witnesses, unlike Urtado, "don't get to read the offense report . . . and come up with a story line by line." While there was a defense objection to this statement, the objection does not comport with the issue on appeal. *See Ibarra v. State*, 11 S.W.3d 189, 197 (Tex. Crim. App. 1999) (holding that nothing is preserved for review if objection at trial does not comport with issue on appeal). The defense did not object to the statement on the ground that it voiced a personal opinion on Urtado's character, but on the ground that the State was "arguing outside the record as far as other witnesses, their abilities to read their statements, whatever." Thus, this objection was insufficient to preserve the complaint made by Urtado on appeal.

During voir dire, the State asked the following question:

> Now, here's the question. I have proven to you beyond a reasonable doubt my elements of aggravated assault, that the defendant on or about a certain date in Travis County intentionally, knowingly, or recklessly caused serious bodily injury to a victim by stabbing him with a knife. The self-defense claim, it may or may not be raised, if I prove to you beyond a reasonable doubt—because the burden shifts back to the State. If I prove to you beyond a reasonable doubt that the defendant was not protecting himself against the unlawful use of deadly force, it wasn't self-defense, will you convict him of aggravated assault?

The defense then objected on the basis that the question asked for a commitment from the jury. The State responded, "I haven't committed them to a specific set of facts so . . . it certainly is a commitment question but in no way [is it] improper." The trial court overruled the objection and the State then posed the question to a number of prospective jurors.

On appeal, Urtado argues that the trial court erred in permitting the State to ask the commitment question because it improperly asked prospective jurors to commit to a specific set of facts prior to the presentation of any evidence. Generally, an attorney cannot attempt to commit a prospective juror to a verdict based on a hypothetical set of facts. *Allridge v. State*, 850 S.W.2d 471, 480 (Tex. Crim. App. 1991). However, the court of criminal appeals has held that a commitment question is not improper when the law requires the commitment in question. *See Standefer v. State*, 59 S.W.3d 177, 181 (Tex. Crim. App. 2001) ("When the law requires a certain type of commitment from jurors, the attorneys may ask the prospective jurors whether they can follow the law in the regard."). For example, it is permissible to ask prospective jurors whether they could follow a law requiring them to disregard illegally obtained evidence, an instruction regarding corroboration of accomplice testimony, or a law that precludes them from holding against the defendant his failure

13

to testify. *Id.* at 181 n.16. Similarly, it is permissible to ask prospective jurors whether they could consider the full range of punishment. *Id.* at 181.

In this case, the State asked potential jurors whether they could convict a defendant of aggravated assault if, after the State proved all of the elements of the offense beyond a reasonable doubt, a self-defense claim was raised and the State then proved beyond a reasonable doubt that self defense did not apply. Because this commitment is required by the law, it is permissible under *Standefer*. *See id.*

Urtado complains that the State's question was specific to his case because it referred to "the defendant," rather than "a defendant." In response, the State argues that the use of the word "the" does not refer to Urtado, but reflects the requirement that the State must prove that the person charged committed the crime alleged and not someone else. In other words, in any given criminal trial, the State must prove beyond a reasonable doubt that "the" defendant on trial committed the offense. This interpretation of the question is supported by the fact that the remainder of the question remains relatively vague, referring to "a certain date" and "a victim," rather than "the date alleged" or "the victim." It is within the sound discretion of the trial court to determine whether a hypothetical commitment question is properly being used to explain the law or being used to improperly commit potential jurors to the specific facts of the case. *See Atkins v. State*, 951 S.W.2d 787, 790 (Tex. Crim. App. 1997). Under the circumstances presented here, we cannot conclude that the trial court abused this discretion in overruling Urtado's objection and permitting the commitment question. Urtado's second issue on appeal is overruled.

14

*Exclusion of Impeachment Evidence*

In his third issue on appeal, Urtado argues that the trial court erred in excluding impeachment evidence that Galvan had been convicted of the misdemeanor offense of interference with an emergency telephone call. *See* Tex. Penal Code Ann. § 42.062 (West Supp. 2010). Evidence of a witness's prior conviction may be admitted for purposes of impeachment, but only if the crime was a felony or "involved moral turpitude," and only if the trial court determines that the probative value of the evidence outweighs its prejudicial effect. Tex. R. Evid. 609(a). Because Galvan's prior conviction was for a misdemeanor offense, it is not admissible under Rule 609(a) unless the offense was a crime of moral turpitude. In what appears to be a case of first impression, Urtado urges this Court to hold that interference with an emergency telephone call represents a crime of moral turpitude, and therefore that the trial court abused its discretion in excluding evidence of Galvan's conviction for this offense.

"Moral turpitude has been defined as the quality of a crime involving grave infringement of the moral sentiment of the community as distinguished from statutory mala prohibita." *Hardeman v. State*, 868 S.W.2d 404, 405 (Tex. App.—Austin 1993, pet. dism'd) (internal quotation marks and citation omitted). Examples of crimes that are not considered crimes of moral turpitude include driving while intoxicated, *Shipman v. State*, 604 S.W.2d 182, 184 (Tex. Crim. App. 1980), gambling, *Miller v. State*, 150 S.W. 635, 657 (Tex. Crim. App. 1912), drug trafficking, *Denman v. State*, 193 S.W.3d 129, 136 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd), and interference with public duties, *Paita v. State*, 125 S.W.3d 708, 713 n.1 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd). In identifying non-violent crimes that constitute

moral turpitude, courts have typically focused on whether the crime involved deception, as past deceptive conduct is relevant to a witness's credibility.[4] *See Lape v. State*, 893 S.W.2d 949, 958 (Tex. App.—Houston [14th Dist.] 1994, pet. ref'd) ("Lying to a police officer or an officer of the court involves moral turpitude . . . because it involves dishonesty."); *Robertson v. State*, 685 S.W.2d 488, 492 (Tex. App.—Fort Worth 1985, no pet.) ("There can be no question that a crime involving false statement and dishonesty is relevant to the credibility of a witness.").

The statutory offense of interference with an emergency call does not require an act of violence or deception. Further, the statute requires no more than a reckless mental state, as an individual commits an offense under the statute by "recklessly render[ing] unusable a telephone that would otherwise be used" to place emergency telephone calls. Tex. Penal Code Ann. § 42.062(b). We consider interference with an emergency call to be similar in nature to the offense of interference with public duties, which encompasses interference with a peace officer, a person employed to perform emergency medical services, or a fire fighter in the course of performing public duties. *See* Tex. Penal Code Ann. § 38.15 (West Supp. 2010); *see also Paita*, 125 S.W.3d at 713 n.1 ("Appellant's prior conviction for interfering with a police officer . . . did not involve a matter of personal morality and was thus not a crime of moral turpitude."). While Urtado suggests that Galvan's conviction may have been related to domestic violence, he did not make an offer of proof on this issue. As a result, we cannot conclude that Galvan's misdemeanor conviction for interference with an emergency telephone call represents a crime of moral turpitude. The trial court did not abuse

---

[4] Crimes of a sexual nature are also typically considered crimes of moral turpitude. *See Holgin v. State*, 480 S.W.2d 405, 408 (Tex. Crim. App. 1972) (prostitution); *Woodall v. State*, 77 S.W.3d 388, 394-95 (Tex. App.—Fort Worth 2002, pet. ref'd) (indecent exposure).

its discretion in excluding evidence of this conviction.  Urtado's third and final issue on appeal is overruled.

## CONCLUSION

We affirm the judgments of conviction.

_____

Diane M. Henson, Justice

Before Chief Justice Jones, Justices Henson and Goodwin

Affirmed

Filed:   February 16, 2011

Publish