TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-09-00644-CR






Floyd Clark, Appellant


v.


The State of Texas, Appellee






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 147TH JUDICIAL DISTRICT

NO. D-1-DC-09-201351, HONORABLE WILFORD FLOWERS, JUDGE PRESIDING





M E M O R A N D U M O P I N I O N


 A jury convicted appellant Floyd Clark of the felony offense of assault family
violence. See Tex. Penal Code Ann. § 22.01(b)(2) (West Supp. 2010). Punishment, enhanced by
a prior conviction for the felony offense of aggravated assault, was assessed at seventeen years'
imprisonment. In six issues on appeal, Clark asserts that he was denied his Sixth Amendment
right to counsel; that his sentence was improperly enhanced by the same prior conviction that was
used as an essential element of the charged offense; that the evidence against him was unlawfully
obtained when officers entered his residence without a warrant and without knocking and
announcing their presence; that the State committed "numerous acts" of prosecutorial misconduct
during trial; that his appointed counsel was ineffective due to "a very serious personality conflict"
between counsel and himself; and that the evidence was insufficient to sustain his conviction. We
will affirm the judgment.


BACKGROUND

 Clark was charged with assaulting his girlfriend, Lisa Champ, on or about March 9,
2009. The couple lived together. The evidence at trial showed that on the night in question,
police officers responded to a 911 call from a neighbor, Janie Govea. Govea testified at trial and
recalled that she "heard a lot of yelling and screaming" and a "female crying out for help," saying,
"Stop, stop." Govea also heard a male voice saying, "I'm tired of your shit. I'm just tired of your
doping ass." Govea added that the male was "really just yelling at [the female] real bad" and that
the yelling lasted for "about five minutes."

 Three or four police officers arrived at the apartment complex in response to the
domestic-disturbance call, including Officers Shana Howell and Brian Huckabee of the Austin Police
Department. Officer Howell testified that as she and Huckabee approached the apartment, she could
hear yelling and screaming coming from inside. Howell also testified that the door to the apartment
was "slightly ajar." Howell "rattled on the door with [her] flashlight," identified herself "as an
Austin police officer," and entered the apartment. Howell recalled that it was "very dark inside" the
apartment. Howell instructed the individuals inside the apartment to "show us their hands," shined
her flashlight throughout the apartment to locate the people inside, and saw a female on the couch
and a "little boy" nearby. Also found inside the apartment were two adult males, later identified as
Clark and his father.

 Howell noticed that the female, later identified as Champ, was sobbing and appeared
injured. Howell testified, "She had swollen lips. She had [what] looked like dried, scabby blood
on her right ear. And then above her right temple, right here, she had more blood. She just looked
like she had been badly beaten up." Also, Champ "kept looking at [Clark] like she was scared of
him." As Clark was being taken out of the apartment by Huckabee, Howell recalled that he began
repeatedly yelling, "Lisa, Lisa." According to Howell, Clark was "bellowing" Champ's name, and
every time he did so, Champ "would just shudder." Howell added, "You could tell it really startled
her just for him to bellow her name like that."

 Howell questioned Champ about the preceding events. According to Howell, Champ
told her that it was Clark's birthday and that Clark and his father had gone to a pool hall, where they
had been drinking. Champ also told Howell that when they returned to the apartment, Clark's father
began calling Champ derogatory names, Clark agreed with his father, and "basically began to beat
her up." Howell asked Champ how many times Clark had hit her, and Champ told her, "I lost count,
but I think it was at least eight times." After Champ explained to Howell what had happened to her,
Howell took her to a mirror and showed Champ her injuries. At some point during her conversation
with Howell, Champ requested an ambulance.

 Howell characterized Clark's temperament at the apartment as "very uncooperative"
and "very aggressive." Howell observed "blood crusted along his fingernails and on his fingertips"
and attempted to photograph the blood on Clark's hands, but she was unable to do so because
"he clenched up his fists . . . and just kind of balled them at his sides." Huckabee provided similar
testimony regarding Clark's appearance and demeanor. Huckabee explained that Clark was
"agitated" and kept yelling Champ's name, "so much so" that "it was obvious that . . . he wasn't
listening to me, any questions that I was asking. And I was beginning to fear that he was maybe
trying to influence or intimidate someone in there. So I walked him to where my patrol car was and
away from the apartment, where it was parked outside." Huckabee also noticed "dried blood on the
palm of [Clark's] hands."

 When the ambulance arrived at the apartment, Brian Parch, a field paramedic,
proceeded to evaluate Champ's injuries. Parch testified that Champ told him that "she was
assaulted," "struck with an open hand," and "choked almost to the point of passing out." Parch
observed a hematoma on the left side of Champ's head and visible abrasions on her upper lip,
right scapula, left flank, and right bicep. Parch testified that these injuries were consistent with
Champ's reported history of having been assaulted. Champ was taken to the emergency room
of Brackenridge Hospital. The registered nurse who had treated Champ, Erin Hunter, testified that
Champ told her that "she was assaulted by [her] boyfriend," that she was "hit in the face by an open
fist," and that she was "strangled to the point of where she nearly passed out." Amy Gangloff, an
emergency room social worker, also observed Champ that night and testified regarding her
observations. Gangloff testified, "I observed bruising to her face, swelling of her lips, and bruising
and red marks to her neck." Champ was photographed at the hospital and the photographs, which
showed visible injuries, were admitted into evidence.

 Champ also testified at trial. She recounted how on the night in question she had
gotten into an argument with Clark and his father. After Clark's father had briefly left the apartment,
Champ explained, Clark accused her of being "disrespectful" to him and began strangling her throat
using both of his hands. Champ testified, "He was squeezing to the point to where he wanted me
to pass out . . . . He was screaming in my face, 'Pass out, bitch. Just pass out.'" Champ continued,
"I was seeing stars, and it was black. There was blackness going across my eyes, until he finally let
go. That's when he proceeded to bang my head up against the wall." When asked how many times
her head struck the wall, Champ testified, "Multiple. I lost count after the third time." After that,
Clark proceeded to strangle Champ a second time. This time, Champ fell to the floor, and Clark then
banged her head against the floor. Champ recalled, "He was telling me the whole time that I'm too
disrespectful. I don't know how to keep my mouth shut. I need to only . . . talk when I am spoken
to." At some point during the beating, Clark's father returned to the apartment, told his son to stop,
and Clark stopped beating Champ. However, Clark continued screaming at Champ and telling her
to "never disrespect anybody ever again." Clark then walked away from Champ, returned with what
appeared to Champ to be a "sawed-off shotgun," "sat it down on the table," and "said something
about having to clean it before it could be used." Champ was afraid that Clark intended to "use" the
shotgun on her. Shortly thereafter, the police arrived.

 During Champ's testimony, the State offered into evidence a letter that Clark
had allegedly written to Champ while he was in jail. Clark had apparently given the letter to his
grandmother, who in turn had mailed it to Champ. In the letter, which was admitted over an
objection by defense counsel to its authenticity, Clark tells Champ that he loves her and asks her to
"stay away from the prosecutor," "don't call nobody," and "stay hidden." Clark also advises Champ
to "write the judge . . . a good character letter," claim that she "had words with [the] girl upstairs
before (a cursing argument)," and "tell the judge" that the police continued asking questions of him
after he had exercised his right to remain silent. Clark further asks Champ to "get [an] affidavit of
non-prosecution," "plead the Fifth Amendment," and refuse to testify.

 Clark's mother and father testified in their son's defense. Clark's mother testified
that she had gotten into a disagreement with Champ several days prior to the alleged assault. Clark's
mother claimed that during the argument, she had struck Champ in the neck with a broom and
had injured her, thus implying that it was she who was responsible for Champ's injuries. Clark's
father testified that on the night of the alleged assault, Champ had "started screaming and cussing"
at Clark and that Clark was only "trying to calm her down." Clark's father denied seeing his son
assault Champ.

 The jury found Clark guilty as charged, and the case proceeded to punishment. The
jury found the State's enhancement allegation to be true, and assessed punishment as noted above.
The district court sentenced Clark in accordance with the jury's verdict. Shortly after trial, defense
counsel moved to withdraw, and the district court granted the motion. New counsel was appointed
on appeal. This appeal followed.


ANALYSIS

Delay in appointment of counsel

 In his first issue, Clark asserts that his Sixth Amendment right to counsel was violated
"when he was not appointed an attorney within a reasonable period of his request." (1) Clark claims
that during the time he was without counsel, he "may have made some ill advised decisions that
counsel may have been able to prevent."

 The Sixth Amendment to the United States Constitution provides that "[i]n all
criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his
defence." U.S. Const. amend. VI. The right to counsel guaranteed by the Sixth Amendment applies
at the first appearance before a judicial officer at which a defendant is told of the formal accusation
against him and restrictions are imposed on his liberty. See Brewer v. Williams, 430 U.S. 387,
398-99 (1977). Once the adversarial judicial process has been initiated, the Sixth Amendment
right to counsel guarantees an accused the right to have counsel present at all "critical stages" of
the criminal proceeding, including during police interrogation after charges have been filed. See
United States v. Wade, 388 U.S. 218, 227-28 (1967); Massiah v. United States, 377 U.S. 201, 204-05
(1964); Hughen v. State, 297 S.W.3d 330, 334 (Tex. Crim. App. 2009). In 2008, the Supreme Court
held that the Sixth Amendment right to counsel attaches at a hearing pursuant to Article 15.17 of the
Texas Code of Criminal Procedure, when the accused is first brought before the magistrate, informed
of the accusations against him, and sent to jail until bail is posted. See Rothgery v. Gillespie County,
554 U.S. 191,199 (2008). At that point, "counsel must be appointed within a reasonable time after
attachment to allow for adequate representation at any critical stage before trial, as well as at trial
itself." Id. at 212. (2)

 The record in this case is unclear as to when counsel was appointed to represent
Clark. The record reflects that Clark was brought before the magistrate for his Article 15.17 hearing
on March 12, 2009, at 1:54 a.m., that he requested counsel at that time, and that he was financially
eligible for court-appointed counsel. There is an "order appointing attorney" attached to Clark's
indigence form in the record, but the order is blank--undated, unsigned, and without the name of
the appointed attorney. On April 20, while confined in jail, Clark filed a pro se application for
writ of habeas corpus in which he claimed, among other things, that he was without counsel. On
May 8, Clark filed a motion to dismiss appointed counsel. In the motion, Clark stated that counsel
had been appointed on April 20. Assuming Clark's statement is correct (and the State does
not contend otherwise), counsel was appointed approximately five weeks after Clark's right to
counsel had attached.

 However, even assuming that this is the length of time that it took for counsel to be
appointed, we cannot conclude from this record that Clark's Sixth Amendment right to counsel was
violated. This right is designed to ensure that a defendant has the assistance of counsel at all "critical
stages" of the criminal proceedings. The Supreme Court has explained the nature of this right: "[I]n
addition to counsel's presence at trial, the accused is guaranteed that he need not stand alone against
the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence
might derogate from the accused's right to a fair trial. . . . The presence of counsel at such critical
confrontations, as at the trial itself, operates to assure that the accused's interests will be protected
consistently with our adversary theory of criminal prosecution." United States v. Wade, 388 U.S.
218, 226-27 (1967). Here, Clark was indicted for the offense on April 16, four days before counsel
was apparently appointed. The record does not reflect that there were any court proceedings in the
case during the weeks between Clark's initial appearance and his indictment, nor does the record
reflect that Clark was subject to any interrogation by the police or other agents of the State while he
was without counsel. And Clark's trial did not begin until October 19, 2009, which gave counsel
approximately six months after he was appointed to consult with his client, investigate the case,
and prepare for trial. The record does not demonstrate that Clark was deprived of counsel during
any "critical stage" of the proceedings. See Rothgery, 554 U.S. at 212 n.16 (defining "critical stages"
as "proceedings between an individual and agents of the State . . . that amount to 'trial-like
confrontations,' at which counsel would help the accused 'in coping with legal problems or . . .
meeting his adversary'") (citing United States v. Ash, 413 U.S. 300, 312-13 (1973); Wade,
388 U.S. at 226).

 Moreover, even if Clark had been deprived of his right to counsel in the weeks
following his initial appearance, Clark would not be entitled to a reversal of his conviction on this
ground unless the record demonstrated harm resulting from the delay. See Satterwhite v. Texas,
486 U.S. 249, 257-58 (1988); Sterling v. State, 830 S.W.2d 114, 121 (Tex. Crim. App. 1992);
see also Chambers v. Maroney, 399 U.S. 42, 54 (1970) ("[W]e are not disposed to fashion a per se
rule requiring reversal of every conviction following tardy appointment of counsel . . . ."); Thomas
v. State, 530 S.W.2d 834, 836 (Tex. Crim. App. 1975) ("Belated appointment of counsel, standing
alone, does not require reversal.").

 Clark claims that he was prejudiced by the delayed appointment of counsel in the
following ways. First, he argues that the letter he wrote to Champ--which was apparently written
prior to the appointment of counsel--"should have never been written." Clark asserts that if he had
received appointed counsel in a reasonable time, he would have been advised not to write the letter
and would have followed that advice. Clark adds that he "made some phone calls that were hurtful
to his case" and asserts that counsel would have advised him "to refrain from discussing his
case on the phone." (3) On this record, such claims are entirely speculative. There is no affidavit or
other evidence in the record tending to show what counsel would have advised Clark or whether
Clark would have refrained from writing the letter or making the phone calls even if he
had been so advised. See Sterling, 830 S.W.2d at 121 ("We are not at liberty to presume
the existence of facts not shown by the record."). Moreover, this argument misconstrues the
nature of the Sixth Amendment right to counsel. The right is not violated "whenever--by luck or
happenstance--the State obtains incriminating statements from the accused after the right to counsel
has attached." Maine v. Moulton, 474 U.S. 159, 176 (1985). Rather, "the Sixth Amendment is
violated when the State obtains incriminating statements by knowingly circumventing the accused's
right to have counsel present in a confrontation between the accused and a state agent." Id. There
is no indication in the record that the letter or phone calls were obtained by the State in such a
manner. See Hall v. State, 67 S.W.3d 870, 874-75 (Tex. Crim. App. 2002), vacated and remanded
on other grounds, 537 U.S. 802 (2002) (admission into evidence of defendant's videotaped statement
to reporters made after right to counsel had attached did not violate Sixth Amendment right to
counsel because there was "no evidence that the authorities prompted the interview" or that reporters
were acting as state agents when they conducted interview).

 Next, Clark claims that he was "clearly prejudiced during the pre-indictment and
pretrial postures of his criminal case" because he had to "resort[] to filing his own habeas application
and motion in limine." These documents, he claims, "were damaging to his case because they were
incomplete and inappropriately addressed irrelevant issues." We have reviewed the documents in
question, and neither document appears harmful to Clark's case in any way. The district court never
ruled on either the pro se motion in limine or the habeas application, and Clark filed a subsequent
motion in limine with the assistance of counsel. If Clark had similarly wanted to file a habeas
application with the assistance of counsel, he could have done so at any time after counsel was
appointed. Other pretrial documents that Clark filed in this case were prepared and filed with the
assistance of counsel.

 Clark also claims that if he had been appointed counsel in a timely manner, "he would
have been informed of the potential legal issue that could have been raised . . . regarding the length
of time he was detained and magistrated." "This issue could have been raised," Clark continues,
"and could have possibly resulted in Mr. Clark's release." But Clark does not identify the "potential
legal issue" regarding the length of Clark's detention, and our review of the record does not reveal
any such issue that could have been raised. Thus, there is nothing in the record to indicate that if
only counsel had been appointed earlier, Clark might have been released from custody.

 We cannot conclude on this record that Clark was deprived of his right to counsel
during any "critical stage" of the proceedings or that he suffered any harm resulting from the
apparent delay in the appointment of counsel. We overrule Clark's first issue.


Punishment

 In his second issue, Clark claims that his sentence was improperly enhanced by
the same prior conviction that was used as an essential element of the charged offense. See Wisdom
v. State, 708 S.W.2d 840, 845 (Tex. Crim. App. 1986) ("The use of a prior conviction to prove an
essential element of an offense bars the subsequent use of that prior conviction in the same
indictment for enhancement purposes."). The record, however, does not support this assertion.

 Clark was charged with the third-degree felony offense of assault family violence.
The elements of this offense are: (1) an assault; (2) committed against a member of the defendant's
family or household or with whom the defendant has had a dating relationship; and (3) the defendant
has been previously convicted of an offense against a member of the defendant's family or household
or with whom the defendant has had a dating relationship. See Tex. Penal Code Ann. § 22.01(a), (b).
Thus, an essential element of the offense is a prior conviction. The conviction that the State used
for this purpose was Clark's 2006 misdemeanor conviction for assault family violence in trial court
cause number 3061736. Clark stipulated to this conviction during trial, and a certified copy of the
judgment of conviction was admitted into evidence without objection.

 This was not the same offense that was used for enhancement purposes. To enhance
Clark's punishment range to that of a second-degree felony, the State alleged that Clark had
been convicted on March 19, 1999, of the felony offense of aggravated assault, in trial court
cause number 0990616. Clark pleaded not true to this allegation. During punishment, the judgment
of conviction for this offense was admitted into evidence, and the jury found that Clark had
been convicted of this offense as alleged. Thus, the record reveals that Clark's sentence was
enhanced by a different prior conviction than the one that was used as an essential element of
the charged offense.

 We overrule Clark's second issue.


Motion to suppress

 In Clark's third issue, he asserts that the evidence against him was obtained following
an illegal entry into his residence by the police. Clark claims that the police entered his apartment
without first knocking and announcing their presence and that all evidence obtained as a result of
that entry should therefore be suppressed. See Wilson v. Arkansas, 514 U.S. 927 (1995) (holding that
Fourth Amendment incorporates common-law requirement that police knock on door of residence
and announce identity and purpose before attempting forcible entry).

 In response, the State first argues that Clark failed to preserve error on this issue. We
agree. To preserve error on the admission of illegally seized evidence, a defendant must either file
a motion to suppress and obtain a ruling on the motion or timely object when the State offers the
evidence at trial. See Tex. R. App. P. 33.1(a); Tex. R. Evid. 103(a)(1); Ross v. State, 678 S.W.2d
491, 493 (Tex. Crim. App. 1984); Ratliff v. State, 320 S.W.3d 857, 860-61 (Tex. App.--Fort Worth
2010, pet. ref'd). When a motion to suppress is not ruled on prior to trial but is instead carried
to trial, the defendant is obligated to make a timely objection when the evidence is offered, renew
his motion to suppress, and obtain a ruling from the trial court. See Garza v. State, 126 S.W.3d
79, 84-85 (Tex. Crim. App. 2004); Thomas v. State, 884 S.W.2d 215, 216-17 (Tex. App.--El Paso
1994, pet. ref'd).

 Here, Clark filed a motion to suppress prior to trial. At the beginning of trial, prior
to voir dire, the district court commented, "You have a motion to suppress illegally seized evidence.
I am certain we have carried it to time of trial." The case then proceeded. When the State later
presented the testimony of the officers who had entered Clark's apartment, counsel did not object
or re-urge his motion to suppress. Thus, the district court never ruled on the motion, and there
is nothing for us to review. See Coleman v. State, 113 S.W.3d 496, 499 (Tex. App.--Houston
[1st Dist.] 2003), aff'd on other grounds, 145 S.W.3d 649 (Tex. Crim. App. 2004) ("The mere filing
of a motion to suppress does not preserve error.").

 Moreover, Officer Howell testified that prior to entering the apartment, she "rattled
on the door with [her] flashlight" and identified herself "as an Austin police officer." Howell also
explained the circumstances surrounding the entry, which included the door being "slightly ajar,"
the apartment being "very dark inside," the yelling and screaming that she heard coming from inside
the apartment, and her concern for the safety of herself and her fellow officers while responding to
a domestic disturbance call. Based on this and other evidence, even if the district court had denied
the motion to suppress, we would not be able to conclude on this record that it was an abuse of
discretion to do so. See Wilson, 514 U.S. at 936 (explaining that there are exceptions to knock-and-announce rule, including "circumstances presenting a threat of physical violence"); Layton v. State,
280 S.W.3d 235, 240 (Tex. Crim. App. 2009) (reviewing court must uphold trial court's decision
to admit evidence "as long as the result is not outside the zone of reasonable disagreement"). We overrule Clark's third issue. 


Prosecutorial misconduct

 In his fourth issue, Clark asserts that the State committed "numerous acts" of
prosecutorial misconduct. Clark complains of the State: (1) introducing hospital records that
were, he claims, irrelevant and misleading; (2) eliciting testimony that a gun was present in the
apartment even though "there was no gun found" in Clark's apartment; (3) during voir dire,
at one point misstating the punishment range for the offense and, while one of the panel members
was using the restroom, continuing to question the panel; (4) making various "improper remarks"
and misstatements during closing argument; and (5) committing "various instances of sidebar and
leading questions during the State's direct examination of their witnesses." Clark claims that these
actions, individually and collectively, denied him due process.

 Clark's briefing merely summarizes the actions that he claims were improper
without providing analysis as to why each action constitutes "prosecutorial misconduct" and
how each action, either individually or collectively, rises to the level of a due process violation. See
Tex. R. App. P. 38.1(i). More importantly, the record reflects that Clark did not object to any of the
above alleged acts of misconduct. Accordingly, Clark has failed to preserve error. See Tex. R. App.
P. 33.1; Cook v. State, 858 S.W.2d 467, 473 (Tex. Crim. App. 1993); Urtado v. State, 333 S.W.3d
418, 426 (Tex. App.--Austin 2011, no pet. h.). Finally, having reviewed the record and the specific
instances of conduct alleged to be improper, we cannot conclude that any of the allegations,
either individually or collectively, would constitute misconduct so severe that Clark was denied
due process and a fair trial. See Berry v. State, 233 S.W.3d 847, 858-59 (Tex. Crim. App. 2007);
Urtado, 333 S.W.3d at 426; Jimenez v. State, 240 S.W.3d 384, 402, 411-12 (Tex. App.--Austin
2007, pet. ref'd); see also United States v. Fields, 483 F.3d 313, 358 (5th Cir. 2007) ("Improper
prosecutorial comments constitute reversible error only where the defendant's right to a fair trial
is substantially affected. A criminal conviction is not to be lightly overturned on the basis of a
prosecutor's comments standing alone. The determinative question is whether the prosecutor's
remarks cast serious doubt on the correctness of the jury's verdict.") (quoting United States
v. Holmes, 406 F.3d 337, 356 (5th Cir. 2005)).

 We overrule Clark's fourth issue.


Ineffective assistance of counsel

 In Clark's fifth issue, he asserts that his right to counsel was violated when he
"requested and was denied new counsel and communications had so clearly broken down between
Mr. Clark and his trial counsel as to deny Mr. Clark's right to effective representation." Clark
attributes the breakdown to the apparent delay in appointing counsel and claims that once
the appointment was made, "a very serious personality conflict" emerged between himself and
trial counsel. Citing to Strickland v. Washington, 466 U.S. 668 (1984), Clark contends that "the
breakdown of their attorney-client relationship and conflict between their interests was tantamount
to errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by
the Sixth Amendment."

 To prevail on a Strickland claim, Clark must prove by a preponderance of the
evidence that counsel was ineffective. Perez v. State, 310 S.W.3d 890, 892 (Tex. Crim. App. 2010).
There are two required components of an ineffectiveness claim: performance and prejudice. Id. 
First, Clark must prove that counsel's performance was deficient. Strickland, 466 U.S. at 687;
Perez, 310 S.W.3d at 892. To satisfy this prong of the analysis, Clark "must show that counsel's
representation fell below an objective standard of reasonableness" based upon "prevailing
professional norms." Strickland, 466 U.S. at 688; Perez, 310 S.W.3d at 893. For this performance
inquiry we consider all of the circumstances, with "a strong presumption that counsel's conduct
falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 688-89;
Perez, 310 S.W.3d at 893.

 "Second, the defendant must show that the deficient performance prejudiced
the defense. This requires showing that counsel's errors were so serious as to deprive the defendant
of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687. To succeed under
the prejudice component, Clark "must show that there is a reasonable probability that, but for
counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.
A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id.
"It is not enough for the defendant to show that the errors had some conceivable effect on the
outcome of the proceeding." Id. at 693. Rather, he must show that "there is a reasonable probability
that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695.
"In making this determination, a court hearing an ineffectiveness claim must consider the totality
of the evidence before the judge or jury." Id. "[A] verdict or conclusion only weakly supported by
the record is more likely to have been affected by errors than one with overwhelming record
support." Id. at 696.

 On this record, we cannot conclude that Clark satisfied his burden to prove that
counsel's performance was deficient. Although Clark filed a motion to dismiss appointed counsel
shortly after counsel had been appointed, the district court never ruled or held a hearing on the
motion. Nor did Clark allege ineffective assistance in his motion for new trial. Thus, our review
of counsel's performance is limited to the record of the proceedings during Clark's trial.

 At the conclusion of the State's case, the district court held a hearing outside
the presence of the jury in which Clark and trial counsel placed matters on the record relating to
their attorney-client relationship. Immediately prior to the hearing, Clark and counsel had a private
conversation regarding whether it was in Clark's best interest to testify. After the conversation
concluded and the hearing commenced, Clark began by accusing counsel of not providing him with
"the advice I need to ascertain [] whether it's in my best interests" to testify. Counsel disputed this:
"I believe I told you in there what I thought. . . . Would you like me to tell you in here what I told
you there?" Clark answered in the affirmative. The following exchange then occurred:


[Counsel]: I told you that I have not known you to be truthful before. I told you
that you have made false statements--


[Clark]: I didn't make a false statement to you.


[Counsel]: May I continue? I told you that you wrote a completely lie-filled
letter to the Court about our interactions. Number two--


[Clark]: Judge, I have a bump on my forehead. I was not born with this.


[Counsel]: Number two, I told you that I thought the fact that if you testify
they're going to catch you in a number of lies, which I don't think
is--


[Clark]: You didn't tell me that in that room.


[Counsel]: Number three, I told you, you have these prior convictions that they
will ask you about. Number four, I told you, you wrote a ridiculous,
asinine letter to the purported victim in this case.


[Clark]: I was supposed to come down here, tell what had happened.


[Counsel]: And if you take the stand now--


[Clark]: She sat down here, told a bunch of lies.


[Counsel]: May I continue? Remember, I told you about the letter you're going
to have to explain that you wrote to the purported victim in this case?
Remember all that stuff?


[Clark]: Yes.


[Counsel]: All right. Do you need me to clarify my--


[Clark]: The first part of the--


[Counsel]: May I continue? Do you need me to clarify any further what my
thoughts are about whether you should testify or not? Because I don't
think you should. Now, do you have any other questions?


[Clark]: You didn't tell the part about where you told me you thought I was an
asshole.


[Counsel]: Well, I did say that, too. Did you have any other questions?



 Clark then proceeded to argue to the district court that it should have appointed him
a different attorney, that he was innocent of the charges against him, and that the State's witnesses
had lied. The district court then returned to the issue of whether Clark wanted to testify. The
district court informed Clark that counsel was a "very knowledgeable" and "excellent" lawyer but
that it was Clark's decision as to whether to testify. The district court also reminded Clark that the
State's indictment alleged "four assault family violence cases" and that counsel "has protected your
right by stipulating to one, so the jury wouldn't hear about the other three." Counsel then asked
Clark, "Do you wish to testify or not?" Clark replied, "No. I don't think it's to my best interests to
testify because of the weight of all my past convictions." The district court then concluded the
hearing, and the trial continued.

 At the close of the defense case, outside the presence of the jury, Clark again
argued to the district court that there were numerous "problems" with the State's case and that there
were "some things [he] tried to get [counsel] to do during the trial that he was not willing to do."
Clark also expressed concern that his "past" would "outweigh everything here" and that the jury
would convict him based on his prior convictions. The district court disagreed, noting that counsel
"has done an excellent job of excluding your past so that there is just one they know of." The trial
then continued. Later, prior to the punishment hearing, counsel asked Clark if he understood that he
had "the absolute right to decide whether you're going to testify. It's your choice." Counsel testified
that he understood that right and that he had chosen not to testify during punishment.

 The above exchanges do not indicate that counsel's performance was deficient. To
the contrary, they indicate that counsel provided Clark with accurate advice concerning the risks of
testifying, that counsel informed Clark of why he had advised against testifying, and that, by advising
Clark to stipulate to one prior conviction, counsel was able to preclude the State from admitting
evidence pertaining to other prior convictions. Although the above exchanges also tend to show that
Clark may have had disagreements and conflicts with his counsel concerning trial strategy,
Clark makes no showing that such disagreements and conflicts rendered counsel's performance
"deficient" as that term is defined in Strickland. See id. at 687 (defining deficient performance
as "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant
by the Sixth Amendment"). Having reviewed the entire record, we find no actions or inactions
by counsel that rise to such a level. Nor does Clark identify any specific instances of deficient
performance in the record.

 We also cannot conclude on this record that Clark proved prejudice. Whatever
disagreements and conflicts that Clark and trial counsel may have had with each other, the record
fails to show a reasonable probability that, but for those disagreements and conflicts, the result of
the proceeding would have been different. See id. at 693-96.

 We overrule Clark's fifth issue.


Sufficiency of the evidence

 In Clark's sixth issue, he claims that the evidence is legally and factually insufficient
to support his conviction. Specifically, he argues that the State's case is "purely conjectural" and
that Champ's injuries "could have easily been sustained when Champ had a physical altercation with
Mr. Clark's mother."

 We no longer employ distinct legal and factual sufficiency standards when reviewing
the sufficiency of the evidence to sustain a criminal conviction. Brooks v. State, 323 S.W.3d 893,
912 (Tex. Crim. App. 2010). Instead, the only standard for determining whether the evidence
proves the defendant's guilt beyond a reasonable doubt is the Jackson due process standard. Id.;
see Jackson v. Virginia, 443 U.S. 307, 319 (1979). Under Jackson, the question presented is
whether, after viewing all the evidence in the light most favorable to the verdict, a rational trier
of fact could have found the essential elements of the offense beyond a reasonable doubt. 443 U.S.
at 319. We assume the trier of fact resolved conflicts in the testimony, weighed the evidence,
and drew reasonable inferences in a manner that supports the verdict. Id. at 318. The reviewing
court may impinge on the trier of fact's discretion only to the extent necessary to guarantee the
fundamental protection of due process of law. Id. at 319.

 This was not a close case. The victim testified in detail concerning the assault
and identified Clark as the person who had assaulted her. A neighbor testified that she heard the
altercation and that a male was screaming at a female who was pleading with the male to "stop."
Police officers who arrived at the scene testified that Champ appeared upset, scared, and injured,
while Clark appeared "agitated," "aggressive," "uncooperative," and literally had "blood on his
hands." Other witnesses testified to the nature and extent of Champ's injuries and described the
injuries as being consistent with an assault. Photographs of Champ's injuries were admitted into
evidence. Although Clark's father denied seeing his son assault Champ, and Clark's mother implied
that it was she who had injured Champ, the jury could have reasonably discounted the testimony of
Clark's parents and instead credited the testimony of the victim, the police officers, and the other
witnesses called by the State. Viewing the above evidence in the light most favorable to the verdict,
we conclude that the evidence is legally sufficient to sustain Clark's conviction.

 We overrule Clark's sixth issue.


CONCLUSION

 We affirm the judgment of the district court.



 __________________________________________

 Bob Pemberton, Justice

Before Chief Justice Jones, Justices Puryear and Pemberton

Affirmed

Filed: July 8, 2011

Do Not Publish
1. We note that in the heading of this and other issues on appeal, Clark claims violations
of both the United States and Texas Constitutions. However, he makes no separate substantive
arguments relating to the Texas Constitution. When an appellant provides no explanation
for construing the Texas Constitution as conferring greater protection in an area of law than
the United States Constitution, the state constitutional claims are waived. See Muniz v. State,
851 S.W.2d 238, 251-52 (Tex. Crim. App. 1993) (holding that failing to provide rationale for
interpreting state constitution more broadly than federal constitution will forfeit error on
state ground).
2. The Supreme Court did not decide in Rothgery what constitutes a reasonable time to
appoint counsel after attachment. It explained:


Our holding is narrow. We do not decide whether the 6-month delay in appointment
of counsel resulted in prejudice to Rothgery's Sixth Amendment rights, and have
no occasion to consider what standards should apply in deciding this. We merely
reaffirm what we have held before and what an overwhelming majority of American
jurisdictions understand in practice: a criminal defendant's initial appearance before
a judicial officer, where he learns the charge against him and his liberty is subject to
restriction, marks the start of adversary judicial proceedings that trigger attachment
of the Sixth Amendment right to counsel.


Rothgery v. Gillespie County, 554 U.S. 191, 213 (2008).

3. Clark does not specify in his brief the phone calls to which he is referring or explain how
they were harmful to his case.