# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---
## NO. 03-09-00644-CR
---

**Floyd Clark, Appellant**

**v.**

**The State of Texas, Appellee**

---
**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 147TH JUDICIAL DISTRICT
NO. D-1-DC-09-201351, HONORABLE WILFORD FLOWERS, JUDGE PRESIDING**
---

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Floyd Clark of the felony offense of assault family violence. *See* Tex. Penal Code Ann. § 22.01(b)(2) (West Supp. 2010). Punishment, enhanced by a prior conviction for the felony offense of aggravated assault, was assessed at seventeen years' imprisonment. In six issues on appeal, Clark asserts that he was denied his Sixth Amendment right to counsel; that his sentence was improperly enhanced by the same prior conviction that was used as an essential element of the charged offense; that the evidence against him was unlawfully obtained when officers entered his residence without a warrant and without knocking and announcing their presence; that the State committed "numerous acts" of prosecutorial misconduct during trial; that his appointed counsel was ineffective due to "a very serious personality conflict" between counsel and himself; and that the evidence was insufficient to sustain his conviction. We will affirm the judgment.

## BACKGROUND

Clark was charged with assaulting his girlfriend, Lisa Champ, on or about March 9, 2009. The couple lived together. The evidence at trial showed that on the night in question, police officers responded to a 911 call from a neighbor, Janie Govea. Govea testified at trial and recalled that she "heard a lot of yelling and screaming" and a "female crying out for help," saying, "Stop, stop." Govea also heard a male voice saying, "I'm tired of your shit. I'm just tired of your doping ass." Govea added that the male was "really just yelling at [the female] real bad" and that the yelling lasted for "about five minutes."

Three or four police officers arrived at the apartment complex in response to the domestic-disturbance call, including Officers Shana Howell and Brian Huckabee of the Austin Police Department. Officer Howell testified that as she and Huckabee approached the apartment, she could hear yelling and screaming coming from inside. Howell also testified that the door to the apartment was "slightly ajar." Howell "rattled on the door with [her] flashlight," identified herself "as an Austin police officer," and entered the apartment. Howell recalled that it was "very dark inside" the apartment. Howell instructed the individuals inside the apartment to "show us their hands," shined her flashlight throughout the apartment to locate the people inside, and saw a female on the couch and a "little boy" nearby. Also found inside the apartment were two adult males, later identified as Clark and his father.

Howell noticed that the female, later identified as Champ, was sobbing and appeared injured. Howell testified, "She had swollen lips. She had [what] looked like dried, scabby blood on her right ear. And then above her right temple, right here, she had more blood. She just looked

2

like she had been badly beaten up." Also, Champ "kept looking at [Clark] like she was scared of him." As Clark was being taken out of the apartment by Huckabee, Howell recalled that he began repeatedly yelling, "Lisa, Lisa." According to Howell, Clark was "bellowing" Champ's name, and every time he did so, Champ "would just shudder." Howell added, "You could tell it really startled her just for him to bellow her name like that."

Howell questioned Champ about the preceding events. According to Howell, Champ told her that it was Clark's birthday and that Clark and his father had gone to a pool hall, where they had been drinking. Champ also told Howell that when they returned to the apartment, Clark's father began calling Champ derogatory names, Clark agreed with his father, and "basically began to beat her up." Howell asked Champ how many times Clark had hit her, and Champ told her, "I lost count, but I think it was at least eight times." After Champ explained to Howell what had happened to her, Howell took her to a mirror and showed Champ her injuries. At some point during her conversation with Howell, Champ requested an ambulance.

Howell characterized Clark's temperament at the apartment as "very uncooperative" and "very aggressive." Howell observed "blood crusted along his fingernails and on his fingertips" and attempted to photograph the blood on Clark's hands, but she was unable to do so because "he clenched up his fists . . . and just kind of balled them at his sides." Huckabee provided similar testimony regarding Clark's appearance and demeanor. Huckabee explained that Clark was "agitated" and kept yelling Champ's name, "so much so" that "it was obvious that . . . he wasn't listening to me, any questions that I was asking. And I was beginning to fear that he was maybe trying to influence or intimidate someone in there. So I walked him to where my patrol car was and

3

away from the apartment, where it was parked outside." Huckabee also noticed "dried blood on the palm of [Clark's] hands."

When the ambulance arrived at the apartment, Brian Parch, a field paramedic, proceeded to evaluate Champ's injuries. Parch testified that Champ told him that "she was assaulted," "struck with an open hand," and "choked almost to the point of passing out." Parch observed a hematoma on the left side of Champ's head and visible abrasions on her upper lip, right scapula, left flank, and right bicep. Parch testified that these injuries were consistent with Champ's reported history of having been assaulted. Champ was taken to the emergency room of Brackenridge Hospital. The registered nurse who had treated Champ, Erin Hunter, testified that Champ told her that "she was assaulted by [her] boyfriend," that she was "hit in the face by an open fist," and that she was "strangled to the point of where she nearly passed out." Amy Gangloff, an emergency room social worker, also observed Champ that night and testified regarding her observations. Gangloff testified, "I observed bruising to her face, swelling of her lips, and bruising and red marks to her neck." Champ was photographed at the hospital and the photographs, which showed visible injuries, were admitted into evidence.

Champ also testified at trial. She recounted how on the night in question she had gotten into an argument with Clark and his father. After Clark's father had briefly left the apartment, Champ explained, Clark accused her of being "disrespectful" to him and began strangling her throat using both of his hands. Champ testified, "He was squeezing to the point to where he wanted me to pass out . . . . He was screaming in my face, 'Pass out, bitch. Just pass out.'" Champ continued, "I was seeing stars, and it was black. There was blackness going across my eyes, until he finally let

4

go. That's when he proceeded to bang my head up against the wall." When asked how many times her head struck the wall, Champ testified, "Multiple. I lost count after the third time." After that, Clark proceeded to strangle Champ a second time. This time, Champ fell to the floor, and Clark then banged her head against the floor. Champ recalled, "He was telling me the whole time that I'm too disrespectful. I don't know how to keep my mouth shut. I need to only . . . talk when I am spoken to." At some point during the beating, Clark's father returned to the apartment, told his son to stop, and Clark stopped beating Champ. However, Clark continued screaming at Champ and telling her to "never disrespect anybody ever again." Clark then walked away from Champ, returned with what appeared to Champ to be a "sawed-off shotgun," "sat it down on the table," and "said something about having to clean it before it could be used." Champ was afraid that Clark intended to "use" the shotgun on her. Shortly thereafter, the police arrived.

During Champ's testimony, the State offered into evidence a letter that Clark had allegedly written to Champ while he was in jail. Clark had apparently given the letter to his grandmother, who in turn had mailed it to Champ. In the letter, which was admitted over an objection by defense counsel to its authenticity, Clark tells Champ that he loves her and asks her to "stay away from the prosecutor," "don't call nobody," and "stay hidden." Clark also advises Champ to "write the judge . . . a good character letter," claim that she "had words with [the] girl upstairs before (a cursing argument)," and "tell the judge" that the police continued asking questions of him after he had exercised his right to remain silent. Clark further asks Champ to "get [an] affidavit of non-prosecution," "plead the Fifth Amendment," and refuse to testify.

5

Clark's mother and father testified in their son's defense. Clark's mother testified that she had gotten into a disagreement with Champ several days prior to the alleged assault. Clark's mother claimed that during the argument, she had struck Champ in the neck with a broom and had injured her, thus implying that it was she who was responsible for Champ's injuries. Clark's father testified that on the night of the alleged assault, Champ had "started screaming and cussing" at Clark and that Clark was only "trying to calm her down." Clark's father denied seeing his son assault Champ.

The jury found Clark guilty as charged, and the case proceeded to punishment. The jury found the State's enhancement allegation to be true, and assessed punishment as noted above. The district court sentenced Clark in accordance with the jury's verdict. Shortly after trial, defense counsel moved to withdraw, and the district court granted the motion. New counsel was appointed on appeal. This appeal followed.

## ANALYSIS

**Delay in appointment of counsel**

In his first issue, Clark asserts that his Sixth Amendment right to counsel was violated "when he was not appointed an attorney within a reasonable period of his request."[1] Clark claims

---

[1] We note that in the heading of this and other issues on appeal, Clark claims violations of both the United States and Texas Constitutions. However, he makes no separate substantive arguments relating to the Texas Constitution. When an appellant provides no explanation for construing the Texas Constitution as conferring greater protection in an area of law than the United States Constitution, the state constitutional claims are waived. *See Muniz v. State*, 851 S.W.2d 238, 251-52 (Tex. Crim. App. 1993) (holding that failing to provide rationale for interpreting state constitution more broadly than federal constitution will forfeit error on state ground).

that during the time he was without counsel, he "may have made some ill advised decisions that counsel may have been able to prevent."

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The right to counsel guaranteed by the Sixth Amendment applies at the first appearance before a judicial officer at which a defendant is told of the formal accusation against him and restrictions are imposed on his liberty. *See Brewer v. Williams*, 430 U.S. 387, 398-99 (1977). Once the adversarial judicial process has been initiated, the Sixth Amendment right to counsel guarantees an accused the right to have counsel present at all "critical stages" of the criminal proceeding, including during police interrogation after charges have been filed. *See United States v. Wade*, 388 U.S. 218, 227-28 (1967); *Massiah v. United States*, 377 U.S. 201, 204-05 (1964); *Hughen v. State*, 297 S.W.3d 330, 334 (Tex. Crim. App. 2009). In 2008, the Supreme Court held that the Sixth Amendment right to counsel attaches at a hearing pursuant to Article 15.17 of the Texas Code of Criminal Procedure, when the accused is first brought before the magistrate, informed of the accusations against him, and sent to jail until bail is posted. *See Rothgery v. Gillespie County*, 554 U.S. 191,199 (2008). At that point, "counsel must be appointed within a reasonable time after attachment to allow for adequate representation at any critical stage before trial, as well as at trial itself." *Id*. at 212.[2]

---

[2] The Supreme Court did not decide in *Rothgery* what constitutes a reasonable time to appoint counsel after attachment. It explained:

> Our holding is narrow. We do not decide whether the 6-month delay in appointment of counsel resulted in prejudice to Rothgery's Sixth Amendment rights, and have

The record in this case is unclear as to when counsel was appointed to represent Clark. The record reflects that Clark was brought before the magistrate for his Article 15.17 hearing on March 12, 2009, at 1:54 a.m., that he requested counsel at that time, and that he was financially eligible for court-appointed counsel. There is an "order appointing attorney" attached to Clark's indigence form in the record, but the order is blank—undated, unsigned, and without the name of the appointed attorney. On April 20, while confined in jail, Clark filed a pro se application for writ of habeas corpus in which he claimed, among other things, that he was without counsel. On May 8, Clark filed a motion to dismiss appointed counsel. In the motion, Clark stated that counsel had been appointed on April 20. Assuming Clark's statement is correct (and the State does not contend otherwise), counsel was appointed approximately five weeks after Clark's right to counsel had attached.

However, even assuming that this is the length of time that it took for counsel to be appointed, we cannot conclude from this record that Clark's Sixth Amendment right to counsel was violated. This right is designed to ensure that a defendant has the assistance of counsel at all "critical stages" of the criminal proceedings. The Supreme Court has explained the nature of this right: "[I]n addition to counsel's presence at trial, the accused is guaranteed that he need not stand alone against

---

no occasion to consider what standards should apply in deciding this. We merely reaffirm what we have held before and what an overwhelming majority of American jurisdictions understand in practice: a criminal defendant's initial appearance before a judicial officer, where he learns the charge against him and his liberty is subject to restriction, marks the start of adversary judicial proceedings that trigger attachment of the Sixth Amendment right to counsel.

*Rothgery v. Gillespie County*, 554 U.S. 191, 213 (2008).

8

the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial. . . . The presence of counsel at such critical confrontations, as at the trial itself, operates to assure that the accused's interests will be protected consistently with our adversary theory of criminal prosecution." *United States v. Wade*, 388 U.S. 218, 226-27 (1967). Here, Clark was indicted for the offense on April 16, four days before counsel was apparently appointed. The record does not reflect that there were any court proceedings in the case during the weeks between Clark's initial appearance and his indictment, nor does the record reflect that Clark was subject to any interrogation by the police or other agents of the State while he was without counsel. And Clark's trial did not begin until October 19, 2009, which gave counsel approximately six months after he was appointed to consult with his client, investigate the case, and prepare for trial. The record does not demonstrate that Clark was deprived of counsel during any "critical stage" of the proceedings. *See Rothgery*, 554 U.S. at 212 n.16 (defining "critical stages" as "proceedings between an individual and agents of the State . . . that amount to 'trial-like confrontations,' at which counsel would help the accused 'in coping with legal problems or . . . meeting his adversary'") (citing *United States v. Ash*, 413 U.S. 300, 312-13 (1973); *Wade*, 388 U.S. at 226).

Moreover, even if Clark had been deprived of his right to counsel in the weeks following his initial appearance, Clark would not be entitled to a reversal of his conviction on this ground unless the record demonstrated harm resulting from the delay. *See Satterwhite v. Texas*, 486 U.S. 249, 257-58 (1988); *Sterling v. State*, 830 S.W.2d 114, 121 (Tex. Crim. App. 1992); *see also Chambers v. Maroney*, 399 U.S. 42, 54 (1970) ("[W]e are not disposed to fashion a per se

9

rule requiring reversal of every conviction following tardy appointment of counsel . . . ."); *Thomas v. State*, 530 S.W.2d 834, 836 (Tex. Crim. App. 1975) ("Belated appointment of counsel, standing alone, does not require reversal.").

Clark claims that he was prejudiced by the delayed appointment of counsel in the following ways. First, he argues that the letter he wrote to Champ—which was apparently written prior to the appointment of counsel—"should have never been written." Clark asserts that if he had received appointed counsel in a reasonable time, he would have been advised not to write the letter and would have followed that advice. Clark adds that he "made some phone calls that were hurtful to his case" and asserts that counsel would have advised him "to refrain from discussing his case on the phone."[3] On this record, such claims are entirely speculative. There is no affidavit or other evidence in the record tending to show what counsel would have advised Clark or whether Clark would have refrained from writing the letter or making the phone calls even if he had been so advised. *See Sterling*, 830 S.W.2d at 121 ("We are not at liberty to presume the existence of facts not shown by the record."). Moreover, this argument misconstrues the nature of the Sixth Amendment right to counsel. The right is not violated "whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached." *Maine v. Moulton*, 474 U.S. 159, 176 (1985). Rather, "the Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent." *Id*. There

---

[3] Clark does not specify in his brief the phone calls to which he is referring or explain how they were harmful to his case.

10

is no indication in the record that the letter or phone calls were obtained by the State in such a manner. *See Hall v. State*, 67 S.W.3d 870, 874-75 (Tex. Crim. App. 2002), *vacated and remanded on other grounds*, 537 U.S. 802 (2002) (admission into evidence of defendant's videotaped statement to reporters made after right to counsel had attached did not violate Sixth Amendment right to counsel because there was "no evidence that the authorities prompted the interview" or that reporters were acting as state agents when they conducted interview).

Next, Clark claims that he was "clearly prejudiced during the pre-indictment and pretrial postures of his criminal case" because he had to "resort[] to filing his own habeas application and motion in limine." These documents, he claims, "were damaging to his case because they were incomplete and inappropriately addressed irrelevant issues." We have reviewed the documents in question, and neither document appears harmful to Clark's case in any way. The district court never ruled on either the pro se motion in limine or the habeas application, and Clark filed a subsequent motion in limine with the assistance of counsel. If Clark had similarly wanted to file a habeas application with the assistance of counsel, he could have done so at any time after counsel was appointed. Other pretrial documents that Clark filed in this case were prepared and filed with the assistance of counsel.

Clark also claims that if he had been appointed counsel in a timely manner, "he would have been informed of the potential legal issue that could have been raised . . . regarding the length of time he was detained and magistrated." "This issue could have been raised," Clark continues, "and could have possibly resulted in Mr. Clark's release." But Clark does not identify the "potential legal issue" regarding the length of Clark's detention, and our review of the record does not reveal

11

any such issue that could have been raised. Thus, there is nothing in the record to indicate that if only counsel had been appointed earlier, Clark might have been released from custody.

We cannot conclude on this record that Clark was deprived of his right to counsel during any "critical stage" of the proceedings or that he suffered any harm resulting from the apparent delay in the appointment of counsel. We overrule Clark's first issue.

**Punishment**

In his second issue, Clark claims that his sentence was improperly enhanced by the same prior conviction that was used as an essential element of the charged offense. *See Wisdom v. State*, 708 S.W.2d 840, 845 (Tex. Crim. App. 1986) ("The use of a prior conviction to prove an essential element of an offense bars the subsequent use of that prior conviction in the same indictment for enhancement purposes."). The record, however, does not support this assertion.

Clark was charged with the third-degree felony offense of assault family violence. The elements of this offense are: (1) an assault; (2) committed against a member of the defendant's family or household or with whom the defendant has had a dating relationship; and (3) the defendant has been previously convicted of an offense against a member of the defendant's family or household or with whom the defendant has had a dating relationship. *See* Tex. Penal Code Ann. § 22.01(a), (b). Thus, an essential element of the offense is a prior conviction. The conviction that the State used for this purpose was Clark's 2006 misdemeanor conviction for assault family violence in trial court cause number 3061736. Clark stipulated to this conviction during trial, and a certified copy of the judgment of conviction was admitted into evidence without objection.

12

This was not the same offense that was used for enhancement purposes. To enhance Clark's punishment range to that of a second-degree felony, the State alleged that Clark had been convicted on March 19, 1999, of the felony offense of aggravated assault, in trial court cause number 0990616. Clark pleaded not true to this allegation. During punishment, the judgment of conviction for this offense was admitted into evidence, and the jury found that Clark had been convicted of this offense as alleged. Thus, the record reveals that Clark's sentence was enhanced by a different prior conviction than the one that was used as an essential element of the charged offense.

We overrule Clark's second issue.

**Motion to suppress**

In Clark's third issue, he asserts that the evidence against him was obtained following an illegal entry into his residence by the police. Clark claims that the police entered his apartment without first knocking and announcing their presence and that all evidence obtained as a result of that entry should therefore be suppressed. *See Wilson v. Arkansas*, 514 U.S. 927 (1995) (holding that Fourth Amendment incorporates common-law requirement that police knock on door of residence and announce identity and purpose before attempting forcible entry).

In response, the State first argues that Clark failed to preserve error on this issue. We agree. To preserve error on the admission of illegally seized evidence, a defendant must either file a motion to suppress and obtain a ruling on the motion or timely object when the State offers the evidence at trial. *See* Tex. R. App. P. 33.1(a); Tex. R. Evid. 103(a)(1); *Ross v. State*, 678 S.W.2d 491, 493 (Tex. Crim. App. 1984); *Ratliff v. State*, 320 S.W.3d 857, 860-61 (Tex. App.—Fort Worth

13

2010, pet. ref'd). When a motion to suppress is not ruled on prior to trial but is instead carried to trial, the defendant is obligated to make a timely objection when the evidence is offered, renew his motion to suppress, and obtain a ruling from the trial court. *See Garza v. State*, 126 S.W.3d 79, 84-85 (Tex. Crim. App. 2004); *Thomas v. State*, 884 S.W.2d 215, 216-17 (Tex. App.—El Paso 1994, pet. ref'd).

Here, Clark filed a motion to suppress prior to trial. At the beginning of trial, prior to voir dire, the district court commented, "You have a motion to suppress illegally seized evidence. I am certain we have carried it to time of trial." The case then proceeded. When the State later presented the testimony of the officers who had entered Clark's apartment, counsel did not object or re-urge his motion to suppress. Thus, the district court never ruled on the motion, and there is nothing for us to review. *See Coleman v. State*, 113 S.W.3d 496, 499 (Tex. App.—Houston [1st Dist.] 2003), *aff'd on other grounds*, 145 S.W.3d 649 (Tex. Crim. App. 2004) ("The mere filing of a motion to suppress does not preserve error.").

Moreover, Officer Howell testified that prior to entering the apartment, she "rattled on the door with [her] flashlight" and identified herself "as an Austin police officer." Howell also explained the circumstances surrounding the entry, which included the door being "slightly ajar," the apartment being "very dark inside," the yelling and screaming that she heard coming from inside the apartment, and her concern for the safety of herself and her fellow officers while responding to a domestic disturbance call. Based on this and other evidence, even if the district court had denied the motion to suppress, we would not be able to conclude on this record that it was an abuse of discretion to do so. *See Wilson*, 514 U.S. at 936 (explaining that there are exceptions to knock-and-

14

announce rule, including "circumstances presenting a threat of physical violence"); *Layton v. State*, 280 S.W.3d 235, 240 (Tex. Crim. App. 2009) (reviewing court must uphold trial court's decision to admit evidence "as long as the result is not outside the zone of reasonable disagreement").

We overrule Clark's third issue.

**Prosecutorial misconduct**

In his fourth issue, Clark asserts that the State committed "numerous acts" of prosecutorial misconduct. Clark complains of the State: (1) introducing hospital records that were, he claims, irrelevant and misleading; (2) eliciting testimony that a gun was present in the apartment even though "there was no gun found" in Clark's apartment; (3) during voir dire, at one point misstating the punishment range for the offense and, while one of the panel members was using the restroom, continuing to question the panel; (4) making various "improper remarks" and misstatements during closing argument; and (5) committing "various instances of sidebar and leading questions during the State's direct examination of their witnesses." Clark claims that these actions, individually and collectively, denied him due process.

Clark's briefing merely summarizes the actions that he claims were improper without providing analysis as to why each action constitutes "prosecutorial misconduct" and how each action, either individually or collectively, rises to the level of a due process violation. *See* Tex. R. App. P. 38.1(i). More importantly, the record reflects that Clark did not object to any of the above alleged acts of misconduct. Accordingly, Clark has failed to preserve error. *See* Tex. R. App. P. 33.1; *Cook v. State*, 858 S.W.2d 467, 473 (Tex. Crim. App. 1993); *Urtado v. State*, 333 S.W.3d 418, 426 (Tex. App.—Austin 2011, no pet. h.). Finally, having reviewed the record and the specific

15

instances of conduct alleged to be improper, we cannot conclude that any of the allegations, either individually or collectively, would constitute misconduct so severe that Clark was denied due process and a fair trial. *See Berry v. State*, 233 S.W.3d 847, 858-59 (Tex. Crim. App. 2007); *Urtado*, 333 S.W.3d at 426; *Jimenez v. State*, 240 S.W.3d 384, 402, 411-12 (Tex. App.—Austin 2007, pet. ref'd); *see also United States v. Fields*, 483 F.3d 313, 358 (5th Cir. 2007) ("Improper prosecutorial comments constitute reversible error only where the defendant's right to a fair trial is substantially affected. A criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone. The determinative question is whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict.") (quoting *United States v. Holmes*, 406 F.3d 337, 356 (5th Cir. 2005)).

We overrule Clark's fourth issue.

**Ineffective assistance of counsel**

In Clark's fifth issue, he asserts that his right to counsel was violated when he "requested and was denied new counsel and communications had so clearly broken down between Mr. Clark and his trial counsel as to deny Mr. Clark's right to effective representation." Clark attributes the breakdown to the apparent delay in appointing counsel and claims that once the appointment was made, "a very serious personality conflict" emerged between himself and trial counsel. Citing to *Strickland v. Washington*, 466 U.S. 668 (1984), Clark contends that "the breakdown of their attorney-client relationship and conflict between their interests was tantamount to errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."

16

To prevail on a *Strickland* claim, Clark must prove by a preponderance of the evidence that counsel was ineffective. *Perez v. State*, 310 S.W.3d 890, 892 (Tex. Crim. App. 2010). There are two required components of an ineffectiveness claim: performance and prejudice. *Id*. First, Clark must prove that counsel's performance was deficient. *Strickland*, 466 U.S. at 687; *Perez*, 310 S.W.3d at 892. To satisfy this prong of the analysis, Clark "must show that counsel's representation fell below an objective standard of reasonableness" based upon "prevailing professional norms." *Strickland*, 466 U.S. at 688; *Perez*, 310 S.W.3d at 893. For this performance inquiry we consider all of the circumstances, with "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 688-89; *Perez*, 310 S.W.3d at 893.

"Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. To succeed under the prejudice component, Clark "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id*. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id*. at 693. Rather, he must show that "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id*. at 695. "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Id*. "[A] verdict or conclusion only weakly supported by

17

the record is more likely to have been affected by errors than one with overwhelming record support." *Id*. at 696.

On this record, we cannot conclude that Clark satisfied his burden to prove that counsel's performance was deficient. Although Clark filed a motion to dismiss appointed counsel shortly after counsel had been appointed, the district court never ruled or held a hearing on the motion. Nor did Clark allege ineffective assistance in his motion for new trial. Thus, our review of counsel's performance is limited to the record of the proceedings during Clark's trial.

At the conclusion of the State's case, the district court held a hearing outside the presence of the jury in which Clark and trial counsel placed matters on the record relating to their attorney-client relationship. Immediately prior to the hearing, Clark and counsel had a private conversation regarding whether it was in Clark's best interest to testify. After the conversation concluded and the hearing commenced, Clark began by accusing counsel of not providing him with "the advice I need to ascertain [] whether it's in my best interests" to testify. Counsel disputed this: "I believe I told you in there what I thought. . . . Would you like me to tell you in here what I told you there?" Clark answered in the affirmative. The following exchange then occurred:

[Counsel]: I told you that I have not known you to be truthful before. I told you that you have made false statements—

[Clark]: I didn't make a false statement to you.

[Counsel]: May I continue? I told you that you wrote a completely lie-filled letter to the Court about our interactions. Number two—

[Clark]: Judge, I have a bump on my forehead. I was not born with this.

18

[Counsel]:   Number two, I told you that I thought the fact that if you testify they're going to catch you in a number of lies, which I don't think is—

[Clark]:   You didn't tell me that in that room.

[Counsel]:   Number three, I told you, you have these prior convictions that they will ask you about. Number four, I told you, you wrote a ridiculous, asinine letter to the purported victim in this case.

[Clark]:   I was supposed to come down here, tell what had happened.

[Counsel]:   And if you take the stand now—

[Clark]:   She sat down here, told a bunch of lies.

[Counsel]:   May I continue? Remember, I told you about the letter you're going to have to explain that you wrote to the purported victim in this case? Remember all that stuff?

[Clark]:   Yes.

[Counsel]:   All right. Do you need me to clarify my—

[Clark]:   The first part of the—

[Counsel]:   May I continue? Do you need me to clarify any further what my thoughts are about whether you should testify or not? Because I don't think you should. Now, do you have any other questions?

[Clark]:   You didn't tell the part about where you told me you thought I was an asshole.

[Counsel]:   Well, I did say that, too. Did you have any other questions?

Clark then proceeded to argue to the district court that it should have appointed him a different attorney, that he was innocent of the charges against him, and that the State's witnesses had lied. The district court then returned to the issue of whether Clark wanted to testify. The

19

district court informed Clark that counsel was a "very knowledgeable" and "excellent" lawyer but that it was Clark's decision as to whether to testify. The district court also reminded Clark that the State's indictment alleged "four assault family violence cases" and that counsel "has protected your right by stipulating to one, so the jury wouldn't hear about the other three." Counsel then asked Clark, "Do you wish to testify or not?" Clark replied, "No. I don't think it's to my best interests to testify because of the weight of all my past convictions." The district court then concluded the hearing, and the trial continued.

At the close of the defense case, outside the presence of the jury, Clark again argued to the district court that there were numerous "problems" with the State's case and that there were "some things [he] tried to get [counsel] to do during the trial that he was not willing to do." Clark also expressed concern that his "past" would "outweigh everything here" and that the jury would convict him based on his prior convictions. The district court disagreed, noting that counsel "has done an excellent job of excluding your past so that there is just one they know of." The trial then continued. Later, prior to the punishment hearing, counsel asked Clark if he understood that he had "the absolute right to decide whether you're going to testify. It's your choice." Counsel testified that he understood that right and that he had chosen not to testify during punishment.

The above exchanges do not indicate that counsel's performance was deficient. To the contrary, they indicate that counsel provided Clark with accurate advice concerning the risks of testifying, that counsel informed Clark of why he had advised against testifying, and that, by advising Clark to stipulate to one prior conviction, counsel was able to preclude the State from admitting evidence pertaining to other prior convictions. Although the above exchanges also tend to show that

20

Clark may have had disagreements and conflicts with his counsel concerning trial strategy, Clark makes no showing that such disagreements and conflicts rendered counsel's performance "deficient" as that term is defined in *Strickland*. *See id*. at 687 (defining deficient performance as "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"). Having reviewed the entire record, we find no actions or inactions by counsel that rise to such a level. Nor does Clark identify any specific instances of deficient performance in the record.

We also cannot conclude on this record that Clark proved prejudice. Whatever disagreements and conflicts that Clark and trial counsel may have had with each other, the record fails to show a reasonable probability that, but for those disagreements and conflicts, the result of the proceeding would have been different. *See id*. at 693-96.

We overrule Clark's fifth issue.

**Sufficiency of the evidence**

In Clark's sixth issue, he claims that the evidence is legally and factually insufficient to support his conviction. Specifically, he argues that the State's case is "purely conjectural" and that Champ's injuries "could have easily been sustained when Champ had a physical altercation with Mr. Clark's mother."

We no longer employ distinct legal and factual sufficiency standards when reviewing the sufficiency of the evidence to sustain a criminal conviction. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). Instead, the only standard for determining whether the evidence proves the defendant's guilt beyond a reasonable doubt is the *Jackson* due process standard. *Id*.;

*see Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  Under *Jackson*, the question presented is whether, after viewing all the evidence in the light most favorable to the verdict, a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.  443 U.S. at 319.  We assume the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict.  *Id*. at 318.  The reviewing court may impinge on the trier of fact's discretion only to the extent necessary to guarantee the fundamental protection of due process of law.  *Id*. at 319.

This was not a close case.  The victim testified in detail concerning the assault and identified Clark as the person who had assaulted her.  A neighbor testified that she heard the altercation and that a male was screaming at a female who was pleading with the male to "stop." Police officers who arrived at the scene testified that Champ appeared upset, scared, and injured, while Clark appeared "agitated," "aggressive," "uncooperative," and literally had "blood on his hands."  Other witnesses testified to the nature and extent of Champ's injuries and described the injuries as being consistent with an assault.  Photographs of Champ's injuries were admitted into evidence.  Although Clark's father denied seeing his son assault Champ, and Clark's mother implied that it was she who had injured Champ, the jury could have reasonably discounted the testimony of Clark's parents and instead credited the testimony of the victim, the police officers, and the other witnesses called by the State.  Viewing the above evidence in the light most favorable to the verdict, we conclude that the evidence is legally sufficient to sustain Clark's conviction.

We overrule Clark's sixth issue.

22

**CONCLUSION**

We affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Puryear and Pemberton

Affirmed

Filed:   July 8, 2011

Do Not Publish