

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-25-00187-CR
No. 02-25-00188-CR
No. 02-25-00189-CR
No. 02-25-00190-CR
No. 02-25-00191-CR
No. 02-25-00192-CR
No. 02-25-00193-CR
No. 02-25-00194-CR
No. 02-25-00195-CR
No. 02-25-00196-CR
No. 02-25-00197-CR
No. 02-25-00198-CR
No. 02-25-00199-CR
No. 02-25-00200-CR
No. 02-25-00201-CR
No. 02-25-00202-CR

———————————————————

ANTHONY MICHAEL KIENLEN, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 78th District Court
Wichita County, Texas
Trial Court Nos. DC78-CR2024-1144-1, DC78-CR2024-1144-2, DC78-CR2024-1144-3, DC78-CR2024-1144-4, DC78-CR2024-1144-5, DC78-CR2024-1144-6, DC78-CR2024-1144-7, DC78-CR2024-1144-8, DC78-CR2024-1144-9, DC78-CR2024-1144-10, DC78-CR2024-1144-11, DC78-CR2024-1144-12, DC78-CR2024-1144-13, DC78-CR2024-1144-14, DC78-CR2024-1144-16, DC78-CR2024-1144-17

Before Kerr, Birdwell, and Bassel, JJ.
Memorandum Opinion by Justice Birdwell

# MEMORANDUM OPINION

## I. Introduction and Brief Background

This is an appeal from an attempted-murder conviction and raises only sufficiency and double-jeopardy issues.

On October 13, 2021, Appellant Anthony Michael Kienlen's wife called 9-1-1 to report that he was armed and intended to commit "suicide by cop." Kienlen had also used his wife's laptop to send a message to her alleged lover John, intending to lure him to their home, and in the 9-1-1 recording, Kienlen can be heard telling his wife that when John got there, he was going to shoot him in the face. Kienlen could also be heard advising her, "You realize when the cops get here, they're going to show up guns drawn, and I'm going to start shooting, right?" He warned her, "A lot of cops are about to lose their lives."[1]

During the 99-minute 9-1-1 call, Kienlen left the house with an AK-47 and fired at the responding officers from a concealed position. He returned to the house for a sniper rifle before going back outside and firing additional shots. He advised a negotiator during the 9-1-1 call that he was a "threat to everybody" and that he was going to shoot at least one of the officers before they could kill him, but he also said that he did not want to hurt anyone and that he was just "shooting at their f-cking

---

[1]Wichita County Sheriff John David Duke testified that between 45 and 50 public servants responded that day. They included volunteer firefighters and peace officers from the Wichita County Sheriff's Office, the Archer County Sheriff's Office, the Department of Public Safety, and the Parks and Wildlife Department.

cars." Drone footage recorded by a volunteer firefighter and by game wardens showed some of Kienlen's activities during the standoff.

No one was injured, and Kienlen eventually surrendered.

The State charged Kienlen with one count of attempted capital murder of a peace officer and multiple counts of aggravated assault of a public servant. As pertinent to this appeal, the State alleged in Count 1 that Kienlen had committed the attempted capital murder of Sergeant Roy Biter of the Wichita County Sheriff's Department, *see* Tex. Penal Code § 19.03, and in Count 2 that Kienlen had committed the offense of aggravated assault against Sergeant Biter, *see id.* § 22.02. The remaining aggravated-assault counts listed the complainants as other public servants who had responded to the scene. Kienlen pled not guilty to the attempted-capital-murder count but made open pleas of guilty to the other counts, and he testified that he had not intended to kill Sergeant Biter when he fired shots at the sergeant's vehicle that day.

The trial court instructed the jury to find Kienlen guilty of the charges to which he had pled guilty and to determine his guilt for the attempted capital murder. The jury followed the trial court's instructions on the aggravated-assault counts, found Kienlen guilty of the attempted-capital-murder count, and assessed his punishment at 30 years' confinement for the attempted-capital-murder conviction and 10 years' confinement for each aggravated-assault conviction. The trial court rendered judgment on the jury's verdicts.

3

In three issues, Kienlen challenges the sufficiency of the evidence to support his attempted-capital-murder conviction and argues that his double-jeopardy rights under the federal and state constitutions were violated because the first aggravated-assault conviction involved the same officer as the attempted-capital-murder conviction, which he argues occurred during the same criminal episode. He does not challenge the remaining aggravated-assault convictions.

Because the evidence is sufficient to support the attempted-capital-murder conviction and because punishing for it and the aggravated-assault conviction is not prohibited by double jeopardy because the offenses arose from distinct, separated-in-time acts, we overrule Kienlen's three issues and affirm the trial court's judgments.

## II. Sufficiency[2]

In his first issue, Kienlen asserts that while the evidence justified the aggravated-assault convictions, there was insufficient evidence to show that he intended to kill anyone as required by the attempted-capital-murder count. He states that he "acted toward all the law[-]enforcement personnel who came to his house that day in the same way, with the same intent," i.e., to threaten them only.

The State responds that from all of the evidence, including Kienlen's verbal expressions of intent to kill police officers and his conduct of firing a deadly weapon multiple times toward them, the jury could have rationally found him guilty beyond a reasonable doubt of attempted capital murder.

---

[2]We combine our evidentiary review with our analysis to avoid repetition.

4

## A. Standard of review and applicable law

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). Evidence is sufficient to support a conviction if a rational jury could find each essential element of the offense beyond a reasonable doubt. *Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020). The jury can believe all, some, or none of a witness's testimony and can draw reasonable inferences from the evidence so long as each inference is supported by the evidence produced at trial. *Id.*

A person commits capital murder if he intentionally or knowingly kills a peace officer who is acting in the lawful discharge of an official duty and who the person knows is a peace officer. *See* Tex. Penal Code §§ 19.02(b)(1), 19.03(a)(1). A person commits criminal attempt if, "with specific intent to commit an offense, he does an act amounting to more than mere preparation that tends but fails to effect the commission of the offense intended." *Id.* § 15.01(a). "A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." *Id.* § 6.03(a). "Intent may be inferred from any facts tending to prove its existence, including the method of committing the crime; the wounds inflicted on the victim; and the defendant's acts, words, and conduct." *Alkayyali v. State*, 668 S.W.3d

5

445, 456 (Tex. App.—Fort Worth 2023), *aff'd*, 713 S.W.3d 780 (Tex. Crim. App. 2025).

## B. Evidence

### 1. The State's case in chief

Sergeant Biter, Deputy Edmundo Garcia, and Corporal Jason Vandygriff, all from the Wichita County Sheriff's Office, were the first to arrive at the scene after Kienlen's wife called 9-1-1. Volunteer Fire Chief Ryan Fetzer also responded to the call that day, which was about a "suicidal subject who had slit his wrists and was threatening to shoot himself." Chief Fetzer was talking to the deputies at the scene when they heard shots fired,[3] and he offered use of his personal drone, which recorded Kienlen's subsequent shots.

Because the law-enforcement officers had been notified of Kienlen's "suicide-by-cop" comments, they had expected him to exit through his property's sole point of entry, which was surrounded by six-foot-high walls, and to "present some sort of threat that [would] produce[] a response from law[-]enforcement officers." However, instead of leaving through the gate to the street, Kienlen fired on them with the AK-47 from a different, unanticipated direction, pulling the trigger five times and using

---

[3]Corporal Vandygriff testified that the first shots fired were attributed by Kienlen's wife in the 9-1-1 call to Kienlen's shooting into the ground outside of his house and that hearing those shots "definitely put everybody on guard."

bullets that could have penetrated the vehicle doors they were using as cover.[4] Corporal Vandygriff and Sergeant Biter both testified that Kienlen's firing from this position felt like an ambush,[5] and Deputy Garcia testified that it felt like Kienlen was trying to kill them.

Sergeant Biter testified that during this initial volley, he could hear rounds hitting around where he was and very close to his head and torso. During Sergeant Biter's testimony, the State published video showing the shots fired by Kienlen at the Wichita Sheriff's Department vehicles.

When asked why he felt like Kienlen had been aiming at him, Sergeant Biter testified,

> We were out there. I had felt pretty exposed in the position I was in, and I think we presented pretty clear targets and the information we had was that, you know, he was wanting to produce a deadly force response from us. So I believe that when I heard those cracking sounds and the whizzing sounds that the gunfire [was] directed at me because I was one of the ones up front.

Corporal Vandygriff testified that those shots were fired at around 2:12 p.m. Wichita County Game Warden Tyler Reed heard these shots as soon as he arrived on the scene.

---

[4]Sergeant Eric Wisch testified that the 7.62 rifle rounds that Kienlen fired from his AK-47 "would [have] cut through [the officers' Chevrolet Tahoe doors] like paper just because of the rifle velocity."

[5]The first volley of shots was not captured in the drone footage. Sheriff Duke arrived after Kienlen fired the first volley. He testified that Kienlen had a tactical advantage based on the higher ground from which he had been shooting, and he nicknamed Kienlen's wall the "Alamo wall" because it was a "big barricade-type wall."

Dispatchers subsequently relayed information from the 9-1-1 call that Kienlen had left the wall and then had returned wearing a helmet and bearing a sniper-style weapon with a scope, at which point—at approximately 2:23 p.m.—the law-enforcement officials heard additional shots. Archer County Game Warden Richard Key, who handled one of the three drones at the scene, testified that as to the second volley, there was "no telling where those rounds were going"[6] but that he felt like his life had been threatened. Some of the officers fired suppressive fire to try to stop Kienlen's attack.

Sergeant Biter and Corporal Vandygriff remained on the scene in a holding pattern until Kienlen's surrender. They testified that the first volley of shots and the second volley of shots were two different incidents within the same episode. Warden Reed testified that bullets from the guns Kienlen had used were capable of reaching all of the law-enforcement officers there that day.

Kienlen's wife's 9-1-1 call, which narrated the entire incident and contained audible comments by Kienlen, illustrating his state of mind, was published to the jury along with an overlay of simultaneous drone footage. Although Kienlen frequently mentioned wanting to die during the call, his statements also included the following:

- "I will kill f-cking everybody. I don't give a sh-t."

---

[6]Sheriff Duke testified that they had issued a "Code Red" for the surrounding large-acreage residential area "for everybody to get hunkered in their houses, stay in their houses, [and not] come outside." One of Kienlen's bullets went through the window of a neighboring family's home and lodged in the wall of their daughter's room.

- "[I]f the cops show up or John shows up, it's going to be a shootout."

- "Tell her to keep the cops back . . . or cops are going to lose their lives today . . . . I just want John."

- "How many do you think I can kill before I get out there?"

- "I bet I can kill every single one of them motherf-ckers."

- "Yeah, I f-cking shot at them first."

After Kienlen surrendered, a crime scene technician processed the scene. In the grass alongside the inner wall of Kienlen's property, she found a Remington Model 700 with a scope, and she found shell casings, a box of live rounds, and three magazines loaded with live rounds around the golf cart from which Kienlen had fired.[7] She also found shell casings and live rounds from an AK-47. Inside the home's bedroom, she found the AK-47, Kienlen's discarded helmet, and his vest with bullet-proof inserts, which he had taken off before he surrendered. She took photos of the bullet damage caused to the vehicles on the scene by Kienlen and by friendly fire.

**2. Defense case in chief**

The first question by defense counsel during Kienlen's testimony was, "Did you intend to kill Roy Biter when you fired at his car that day?" Kienlen responded, "No, I did not."

---

[7]Sheriff Duke testified that Kienlen was able to move around using the golf cart to "wherever he wanted to come up and engage," so that they did not know "where he was going to pop up at." Once the drones were in the air, however, they were able to view Kienlen's position.

Kienlen's direct testimony focused on the domestic dispute's background; his suicide attempts the night before and earlier that day; his Army service in Afghanistan that ended in 2009 with a 100% medical discharge for post traumatic stress disorder; and his alcoholism and consumption of half a bottle of Jim Beam before the standoff, leaving his memory in "bits and pieces after that." Kienlen also admitted that he had shot in the direction of the officers' vehicles but insisted that he had not been aiming for Sergeant Biter or trying to kill him.

During cross-examination, Kienlen testified as follows:

Q And you know what happens when you shoot at someone's head?

A Yes.

Q And you shot at Roy Biter's head that day?

A No.

Q Okay. Well, you just testified earlier, and you said in the 911 call, that you shot at officers. Did you not say that?

A I did say that and I also said that it was a -- more of a general type statement. I wasn't -- it was just --

Q Well, you testified earlier that when you looked down the road -- and you saw the two SUVs down the road; is that right?

A I said that I saw three, but I said two of them were white.

Q Okay. Two of them were white. Did you know that their doors were open?

A On my side of the vantage point, they were not open.

10

Q Okay. They were not open. So you testified that you thought the deputies were behind the vehicles?

A Yes.

Q And that you know that when you shoot at vehicles that the bullet can go through the vehicle and hit anything behind it, right?

A It's a possibility.

Kienlen further testified as follows:

Q And you knew what would happen if that round had gone anywhere near someone's head -- or, I'm sorry, had hit someone in the head, right?

A Of course, I knew what would happen if the round hit them in the head.

Q And then you knew that that round hit any human being would likely cause death the moment you shot them?

A I do accept responsibility for that, yes.

Q And you had that knowledge at the time?

A Knowledge of what?

Q That that round hitting a human being would likely cause death.

A If it had hit a human being, it would have.

Q And you shot not one, not two, not three, not four, but five rounds that you knew would cause death if it hit a human being?

A Potentially cause death, but yes, I did fire five rounds.

Kienlen insisted that he had been firing in the direction of the vehicles but had been shooting "high and wide." He denied that he had set up an ambush or that he had known that he had lost his tactical advantage when he saw the drones.

### 3. The State's rebuttal

The State called Texas Ranger Andy Craig Stephens, who explained the "loophole" concept, which "refer[s] to a shooter's position" that offers the shooter "cover and concealment . . . but still [gives] a window that is large enough to provide effective fire on [the shooter's] intended targets." He opined that Kienlen would have learned that tactic during infantry training and that Kienlen had used it in this instance.

Ranger Stephens also defined the term "cone of fire," which describes a weapon's capability and the flight path of its bullets. He explained that circumstances that might expand the cone of fire would include an unstable firing position, an inexperienced shooter, or a drunk shooter. He stated that where the deputies had been positioned provided no effective cover from a shooter who was "standing on the back of the golf cart," that Kienlen's actions had been consistent with an ambush, that Sergeant Biter had been within Kienlen's cone of fire, and that Kienlen's behavior was inconsistent with a suicide by cop.

The State also called Texas Ranger Matt Kelly, who had been the second negotiator to speak with Kienlen during the 9-1-1 call. He opined based on the range

of emotions Kienlen had displayed during that call that Kienlen had been very dangerous to law enforcement and to the general public in the vicinity.[8]

**C. Analysis**

Kienlen argues that it is undisputed that (1) he fired between two and five shots from an AK-47 in the direction of law-enforcement officers, including Sergeant Biter; (2) the officers were there in performance of their duty; and (3) Kienlen wore body armor and a helmet during the standoff, and he argues that this evidence "perhaps supports an inference, and constitutes some evidence, that supports the State's allegation in Count 1 . . . that he intended to kill Roy Biter." He contends, however, that other evidence dictates a different conclusion: "that while [his] actions justified an aggravated assault charge, [they do] not sufficiently prove that he intended to kill anyone." He directs us to portions of his own testimony,[9] portions of Sergeant Biter's

---

[8]During the State's case in chief, Sheriff Duke testified that in his forty-one years of law-enforcement experience, the most dangerous calls were domestic situations because they were so volatile.

[9]Kienlen directs us to his testimony that he had aimed high at the vehicles and that he could not see the officers but that he had known based on his training and experience that "they would most likely put the engine block in between [him] and themselves." He stated, "I had said I was going to shoot at them, so I assumed that they would take defensive positions."

testimony,[10] and the inferences he would like drawn from those portions.[11] The State responds by directing us to Kienlen's actual words and actions.

As set out above through the testimony of multiple witnesses, drone footage, other physical evidence, Kienlen's statements during his wife's 9-1-1 call, and Kienlen's testimony, there was ample evidence from which the jury could have reasonably concluded that Kienlen had committed the attempted capital murder of Sergeant Biter. Specifically, through Kienlen's words and actions at the scene and from the jury's determination of his credibility at trial, the jury could have reasonably determined that during the first volley Kienlen had intentionally attempted to kill Sergeant Biter, who was acting in lawful discharge of an official duty and who Kienlen knew was a peace officer, by performing an act amounting to more than mere preparation—arming himself with an AK-47 and firing five shots at vehicles he knew were insufficient to protect the officers behind them—but that failed to result in Sergeant Biter's death. *See* Tex. Penal Code §§ 6.03(a), 15.01(a), 19.02(b)(1), 19.03(a)(1); *Alkayyali*, 668 S.W.3d at 456 (stating intent may be inferred from the

---

[10]Sergeant Biter testified on cross-examination that during the second volley, Kienlen fired away from the officers and to the east and that he did not know who was being fired upon at that point.

[11]Kienlen asserts that his return to the firing platform with the scoped rifle reflected his "decision not to use a more powerful, accurate weapon against law enforcement or Biter in particular," claiming this "indicates he did not mean to cause harm" during the first volley and "intended only to provoke the police into shooting him."

14

method of committing the crime and the defendant's acts, words, and conduct). We overrule Kienlen's first issue.

### III. Double Jeopardy

Kienlen also argues that his convictions for attempted capital murder and for aggravated assault of a public servant—which he asserts is a lesser-included offense of attempted capital murder—violated double jeopardy under the federal and state constitutions when both offenses were committed against Sergeant Biter and arose from the same criminal transaction. The State responds that the convictions do not violate double jeopardy because the jury heard about Kienlen's distinct, separated-in-time acts of trying to kill Sergeant Biter with gunshots and then later threatening him with another round of gunfire.

### A. Applicable law

The Fifth Amendment offers protection against multiple punishments. *Bien v. State*, 550 S.W.3d 180, 184 (Tex. Crim. App. 2018).[12] The two contexts in which a multiple-punishments claim can arise are (1) the lesser-included offense context, in which the same conduct is punished twice; once for the basic conduct, and a second time for that same conduct plus more (for example, attempted assault of Y and assault of Y; assault of X and aggravated assault of X); and (2) punishing the same criminal act twice under two distinct statutes when the legislature intended the conduct to be

---

[12]Because Kienlen admits that "[c]onceptually, the United States and Texas double[-]jeopardy provisions are identical," we will not address them separately.

punished only once (for example, causing a single death by committing both intoxication manslaughter and manslaughter). *Bigon v. State*, 252 S.W.3d 360, 370 (Tex. Crim. App. 2008).

Double jeopardy bars separate punishment when the offenses are based upon the *same* assaultive conduct against a single person, *see Shelby v. State*, 448 S.W.3d 431, 434 (Tex. Crim. App. 2014).[13] However, the protection against double jeopardy does not apply to separate and distinct offenses that occur during the same transaction. *Ex parte Milner*, 394 S.W.3d 502, 506 (Tex. Crim. App. 2013); *see Ex parte Benson*, 459 S.W.3d 67, 73 (Tex. Crim. App. 2015); *Ervin v. State*, 991 S.W.2d 804, 814 (Tex. Crim. App. 1999).[14] This is true even if the acts are committed close in time to one another. *Sanchez v. State*, 269 S.W.3d 169, 170 (Tex. App.—Amarillo 2008, pet. ref'd); *see*

---

[13]In *Shelby*, the defendant, who was driving with a blood-alcohol concentration of .13, hit a parked police car, injuring an officer. 448 S.W.3d at 434. The defendant was convicted of aggravated assault against a public servant with a deadly weapon and intoxication assault of the same public servant, stemming from the same criminal act. *Id.* The court held that double jeopardy would not allow these dual convictions stemming from the same criminal act. *Id.* (concluding "that the Legislature did not intend to authorize separate punishments for the[se] offenses . . . when the convictions for those offenses are based upon the same assaultive conduct against a single person").

[14]In *Ervin*, the Court of Criminal Appeals set out a nonexclusive list of considerations to augment the initial *Blockburger* test regarding whether the offenses have a common focus (i.e., same gravamen) and "whether that common focus tends to indicate a single instance of conduct." 991 S.W.2d at 814 (referencing *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180 (1932)). In *Benson*, the court explained that when "two distinct statutory provisions are at issue," the reviewing court must also perform a "units analysis," part of which requires examining the record to determine how many units have been shown. 459 S.W.3d at 71, 73–74.

16

*Simmang v. State*, No. 03-11-00455-CR, 2013 WL 5272919, at *10 (Tex. App.—Austin Sept. 11, 2013, pet. ref'd) (mem. op., not designated for publication) ("[I]f two different attacks occur, even if close in time, a defendant may be charged with two separate assaultive offenses."); *see also Ex parte Ward*, No. 05-25-00801-CR, 2025 WL 2880830, at *3 (Tex. App.—Dallas Oct. 9, 2025, pet. ref'd) (mem. op., not designated for publication) (same); *McMillian v. State*, No. 11-22-00155-CR, 2024 WL 4229725, at *4 (Tex. App.—Eastland Sept. 19, 2024, no pet.) (mem. op., not designated for publication) (same); *Urtado v. State*, 333 S.W.3d 418, 424 (Tex. App.—Austin 2011, pet. ref'd) (same).

In *Sanchez*, for example, the appellant complained that his double-jeopardy rights were violated when he was convicted on two counts of aggravated assault with a deadly weapon. 269 S.W.3d at 170. The State had charged him with aggravated assault by striking his girlfriend with a hard object and also with aggravated assault by threatening her with imminent bodily injury. *Id.* Our sister court affirmed the convictions because each assault had occurred during a discrete stage of the appellant's two-hour attack on his girlfriend. *Id.* Specifically, he began striking her in one room of the house before dragging her into the bedroom, retrieving a handgun, and hitting her with it. *Id.* at 170–71. The appellant then told her to shower off the blood, and she complied while he calmed down. *Id.* at 171. He then told her there were two bullets in the gun, one of which was for her, and made other threats of harm to her and her children if she called the police. *Id.*

17

The court noted that there had been two different attacks, the latter arising after a break from the former and changing in nature from physical to psychological, presenting two different crimes. *Id.*; *see also McMillian*, 2024 WL 4229725, at *4 (concluding that each aggravated assault against the same complainant was a distinct event when the appellant first pointed his gun at her in the ambulance, supporting the first aggravated assault (using a gun), and then—after the complainant had briefly escaped and returned to assist her colleague—the appellant turned his knife on her and attempted to stab her, supporting the second aggravated assault (using a knife)); *Urtado*, 333 S.W.3d at 424–26 (observing that as to the two counts involving Trujillo, "the evidence suggests that the assault causing bodily injury against Trujillo was a separate event from the assault by threat against Trujillo" and that as to the two counts involving Galvan, witnesses "made a distinction in their testimony between the first struggle between [the appellant] and Galvan" and the second, the beginning of which could "also be heard on the recording of the 9-1-1 call, indicating a break in the action between the first and second assaults").

## B. Analysis

Here, we need not perform an elements analysis because even if the offenses are the same under that analysis, separate units of prosecution were allowable on this record.

18

## 1. Background

Before trial, the prosecutor informed the trial court, without objection by Kienlen: "Because there were multiple shots, it's going to be the State's position that the capital murder is separate and distinct from Count 2, the aggravated assault of a public servant." During opening statements, the prosecutor told the jury not to

> mistake that Count 1 and Count 2 are the same. They are not. The act of pointing the gun, the act of threatening Biter with imminent bodily injury with the gun, and the shots that weren't the near miss, is what [Kienlen] pled guilty to on Count 2. The first shot itself, the one that nearly blew Biter's head off, that's Count 1. Both can and did exist on October 13th and the evidence will show you that. Be thinking of the distinction during trial. The first shot aimed at [Biter's] head intended to kill him, and the rest [Kienlen]'s pled guilty to.

Kienlen did not object to or address the Count 1–Count 2 distinction during his opening statement. Instead, he stated, "And you will see the evidence that shows he wasn't trying to kill Roy Biter. He was trying to scare those officers."

Kienlen raised double jeopardy during the charge conference, arguing that his firing multiple shots did not mean that every shot would be a different criminal episode and that "[t]his [entire event] is clearly one criminal episode." Kienlen referred the trial court to *Meine v. State*, 356 S.W.3d 605 (Tex. App.—Corpus Christi–Edinburg 2011, pet. ref'd) (mem. op.),[15] and *Teeter v. State*, PD-1169-09, 2010 WL

---

[15]In *Meine*, the defendant shot at security officers in a bank parking garage. 356 S.W.3d at 608. Specifically, the defendant fired two shots in the direction of one of the officers, who heard several more shots as he went for cover, and one bullet hit another officer's wristwatch. *Id.* After the defendant's arrest, the officers recovered a revolver and five fired shells. *Id.* A jury convicted the defendant of two counts of

3702360 (Tex. Crim. App. Sept. 22, 2010) (not designated for publication),[16] both of which involved two charges for the same act and victim. After the prosecutor responded, "There's a break in time and a different weapon," the trial court overruled Kienlen's objection and rejected his proposed jury-charge language.

## 2. Application

As set out in our sufficiency recitation above, at around 2:12 p.m., the first volley of shots occurred when Kienlen fired an AK-47 five times at the vehicles behind which Sergeant Biter and others were taking cover. The second volley of shots occurred eleven minutes later, at 2:23 p.m., after Kienlen went into his house to put on his helmet and to retrieve a sniper-style weapon, which he used to fire the second volley. The second volley was not necessarily directed at the officers taking cover behind the vehicles—as Warden Key testified, there was "no telling where those rounds were going"—but they were threatening nonetheless.

---

aggravated assault on a public servant and two counts of attempted capital murder, and he appealed, arguing that double jeopardy had been violated because his convictions were based on the same conduct. *Id.* at 607–08. The court compared the elements of each offense and determined that the same action—firing the gun—was the only evidence to show either the intent to threaten with imminent bodily injury or the intent to commit capital murder, so under the indictment, the State could not prove the greater offense without also proving the lesser offense. *Id.* at 609–10. The court vacated the two counts of aggravated assault on a public servant. *Id.* at 613.

[16]In *Teeter*, the defendant pointed a pistol at the officer one time. 2010 WL 3702360, at *2. The State charged the defendant with both the attempted capital murder of the officer and the aggravated assault by threat of the officer based solely on the one act. *Id.*

20

As shown at trial, the second volley was not the same assaultive conduct as the first volley—these were separate and distinct offenses that occurred during the same overall transaction, *see Milner*, 394 S.W.2d at 506; *Sanchez*, 269 S.W.3d at 170, unlike the offenses in *Meine*, 356 S.W.3d at 609–10, and *Teeter*, 2010 WL 3702360, at *6–7, which each involved a single act leading to two convictions under separate statutes in violation of double jeopardy. Because Kienlen's double-jeopardy rights were not violated, we overrule his second and third issues.

## IV. Conclusion

Having overruled all of Kienlen's issues, we affirm the trial court's judgments.

/s/ Wade Birdwell

Wade Birdwell
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: May 7, 2026